## THE CITY OF EVANSVILLE v. SENHENN.

[No. 18,024.   Filed Sept. 15, 1897.   Rehearing denied June 29, 1898.]

PARENT AND CHILD.—*Damages.—Action by Child.—Contributory Neg-*
*ligence of Parents Not Imputable to Child.*—The negligence of the
parents of an infant of such tender years as incapacitates it to
exercise due care cannot be imputed to the child as contributory
negligence of the child, in an action by the child for damages caused
by the negligence of defendant. *Lafayette, etc., R. R. Co.* v. *Huff-*
*man,* 28 Ind. 287, and *Hathaway* v. *Toledo, etc., R. W. Co.,* 46 Ind.
25, overruled in part. *pp. 42-57.*

MUNICIPAL CORPORATIONS. — *Streets. — Obstruction. — Damages.*— A
city is not liable for damages resulting from the negligence of a
contractor who in supplying such city with lumber had piled same
in the street, where the city had no notice of such negligent act,
either express or implied. *pp. 58-61.*

SAME.—*Streets.— Obstructions.— Builder's Material.— Damages.*— A
city is not liable in damages for injuries resulting from the negli-
gent acts of a builder in placing lumber in the street, unless it had
notice, express or implied, that the lumber had been placed in the
street and that it was in a dangerous condition. *pp. 58-61.*

APPEAL AND ERROR.—*Rehearing.*—A question raised for the first time
on a petition for a rehearing which might have been raised before
is not entitled to notice. *pp. 62, 63.*

From the Warrick Circuit Court.   *Reversed.*

*George A. Cunningham,* for appellant.

*J. E. Williamson* and *D. C. Givens,* for appellee.

McCABE, C. J.—The appellee sued the appellant in
the superior court of Vanderburg county for damages
arising from a personal injury caused by the falling of

a pile of lumber through the alleged negligence of appellant, resulting in the loss of appellee's foot, in August, 1874, when she was but about five years old. The venue was changed to the Warrick Circuit Court, where a trial resulted in a verdict and judgment for the defendant. On an appeal to this court that judgment was reversed for error in instructing the jury. *Senhenn* v. *City of Evansville,* 140 Ind. 675. On the return of the case to the circuit court another trial resulted in a verdict and judgment for the plaintiff over defendant's motion for a new trial. The only error assigned is upon the action of the trial court in overruling appellant's motion for a new trial. The only errors complained of and urged by appellant under that motion are the giving and refusal of certain instructions by the trial court.

One of the most important questions in the case arises upon the court's refusal to give instruction number thirteen asked by the appellant, reading as follows: "If the plaintiff's parents knew that the pile of lumber was in the street, and was dangerous and liable to fall, then it was their duty to exercise reasonable care in keeping the plaintiff away from the same; and if they failed to exercise such reasonable care, and such failure directly contributed to the injury, then the plaintiff cannot recover." The evidence was such as to make this instruction applicable if it expresses the law correctly on the facts. This instruction raises one of the most vexed questions in the law. It is well settled that an infant of tender years is deemed in law not possessed of sufficient discretion to make it guilty of negligence for its failure to exercise due care for its own safety. Shearman & Redfield on negligence (3d ed.), 48 and note 1; 2 Thomp. Neg. 1181. On that point there is no conflict of opinion. But there is a sharp conflict of opinion between courts of last re-

sort as to whether the negligence of the parent or guardian having the custody and control of such infant in exposing it to danger from the negligence of others whereby it is injured, can be attributed to such infant so as to defeat its right of recovery therefor. It is contended by appellee's counsel, in support of the correctness of the court's action, that the overwhelming weight of judicial decisions condemns the instruction, while appellant contends that this court is committed to the doctrine expressed by the instruction in a long line of its own decisions in proof of which we are cited to the cases of *Pittsburg, etc., R. W. Co.* v. *Vining's Admr.*, 27 Ind. 513; *Lafayette, etc., R. R. Co.* v. *Huffman*, 28 Ind. 287; *Jeffersonville, etc., R. R. Co.* v. *Bowen*, 40 Ind. 545; *Hathaway* v. *Toledo, etc., R. W. Co.*, 46 Ind. 25; *Evansville, etc., R. R. Co.* v. *Wolf*, 59 Ind. 89; *Mayhew* v. *Burns*, 103 Ind. 328; *Indianapolis, etc., R. W. Co.* v. *Pitzer*, 109 Ind. 179; *Louisville, etc., R. W. Co.* v. *Shanks*, 132 Ind. 395; *Indianapolis, etc., R. W. Co.* v. *Wilson*, 134 Ind. 95; *Cleveland, etc., R. W. Co.* v. *Keely*, 138 Ind. 600.

But it is contended by appellant's counsel that the question here involved, namely, whether the contributory negligence of the parents of an infant plaintiff of such tender years as incapacitates it to exercise due care is imputable to the child, was not presented, considered, or decided in any of these cases. This claim is a little too broad. That question may not have been presented or considered in any of those cases, and we are inclined to think that is true. But in two of the cases only was it decided. It is recognized as established law everywhere that in an action by a parent on account of the death of such an infant of tender years under statutes for the death of the child caused by the negligence of the defendant and for loss of services where death did not ensue, at common law,

The City of Evansville *v.* Senhenn.

the parent's negligence through which the child was exposed to the danger contributing to the injury defeats the parent's action, it being recognized that there is no difference in the effect of such negligence on the part of the parent in such an action and the effect of his negligence contributing to an injury to his own person or property. In either case he attempts to found an action for damages on his own negligence and wrong, which would be manifestly unjust as well as against principle and authority. But where the child brings the action to recover damages for its own injury, where the judgment recovered must inure to its own exclusive benefit, where its improvident actions contributed to such injury, manifestly a very different question is presented. The law taking cognizance of its want of discretion, and that its tender years renders it impossible for it to know any better, exempts it from the charge of negligence.

Upon what principle then, we are led to inquire, may its parent's, guardian's or custodian's negligence be imputed to it so as to take away its property in its cause of action for defendant's negligence making it a cripple for life? We know of none unless this court is by its previous decisions irretrievably committed to that doctrine.

The first case cited above, viz., *Pittsburg, etc., R. W. Co.* v. *Vining's Admr., supra,* was a case where the father as administrator, recovered the judgment for the death of his son through the negligence of the defendant railway company. The judgment was reversed for error in overruling a demurrer to the complaint assigning for cause insufficiency of facts; (2) that the plaintiff had no legal capacity to sue as administrator of his infant son. It was held that the right of action by the statute was in the father as such, and not in the administrator, and it was further

held that the complaint was bad for failure to allege that the parents of the infant, which was seven years of age, were free from contributory negligence, and it was also held that the evidence was insufficient.. This decision was clearly right, because under the statute the cause of action, if any existed, belonged to the father as such. That right of action for the negligence of the defendant could only be maintained by him by allegation and proof that his own negligence did not contribute to the injury sued for, as in any other suit by him for negligence. There was not any question made, as there could not have been made any question in the case as to the imputability of the parent's negligence to the injured child. Yet this court, in support of its conclusion, cited the leading case, and the one which originated the doctrine of imputing the negligence of the parent or custodian to the child, namely, *Hartfield* v. *Roper*, 21 (N. Y.) Wend. 615 decided by the supreme court of New York in 1839. While that case decides that the contributory negligence of the parent may defeat an action for injury through negligence to an infant who is *non sui juris*, making it to that extent applicable, and affords support to the conclusion reached in the Vining case, yet *Hartfield* v. *Roper*, *supra*, goes further, and originates the doctrine of the imputability of the parent's negligence to the child so as to defeat its right of action, a proposition not involved in the Vining case.

The next case in which any question of the sort was involved, coming up before this court, was *Lafayette, etc., R. R. Co.* v. *Huffman*, *supra*, and that case did involve the precise question here involved, but it appears from the case that this court did not think any other or different question was presented than that presented and decided in the Vining case. There is not a word in the case that indicates that this court in-

tended to decide that an infant *non sui juris* injured by
negligence is chargeable with the negligence of its
parents contributing to its injury. The case is de-
cided upon the theory, simply, that the parent's negli-
gence contributing to the injury defeats the action. The
only authority cited for such conclusion is the Vining
case, and that this court supposed it was deciding
nothing but the same question that had been decided
by it in that case is clearly evidenced by the language
in reference thereto in the Huffman case as follows:
"We are clear that the law was correctly stated, [in
the Vining case] and its application to this case cannot
be questioned." That case was correctly decided, as
we have already seen, and that seems to be all this
court supposed it was deciding in the Huffman case,
the opinion being delivered in both cases by the same
judge, Ray. But the latter case necessarily decides an
entirely different question than the former, namely,
that the negligence of the parent may be imputed to
the injured child who is *non sui juris* so as to defeat its
action for its own injury caused by a defendant's neg-
ligence.

The most cogent reasons ought to be shown why
such an inconsiderate judgment should bind this court
to a rule thus inadvertently established, and without
consideration of the real question involved and de-
cided. We are now for the first time in the history of
our court asked to give the question consideration,
and say whether in our judgment, the law imputes the
parent's negligence to the child *non sui juris* in such
an action. The decision in the Huffman case is the
principal barrier to such consideration and decision,
and while it is the policy of the law not to depart from
decisions previously made by a court of last resort, yet
the same law does require such departure where ad-
herence to such decisions would be productive of more

evil than the departure therefrom, and the establish-
ment of the better and sounder rule.  It is very sel-
dom that a departure from decisions which establish
a rule of property can be justified.  But the decision
in the Huffman case does not establish a rule of prop-
erty. The only other case in this court that can be con-
strued into holding to the doctrine necessarily in-
volved in the decision in the Huffman case is *Hatha-
way* v. *Toledo, etc., R. W. Co.*, 46 Ind. 25.  That case did
necessarily involve the same question involved and
decided in the Huffman case.  And for the first time
this court seemed to realize what had been decided
without consideration in the Huffman case in the fol-
lowing language by Downey, J., delivering the opinion
of the court, namely:  "It seems harsh to apply this
doctrine to a case where damage occurs to a child,
and yet the application is made, and this whether the
fault is that of the child itself or the negligence of
the person under whose immediate care it is.   *   *   *
This doctrine is sanctioned by several decisions
of this court.  *Pittsburgh, etc., R. W. Co.* v. *Vining's
Admr.*, 27 Ind. 513; *Lafayette, etc., R. R. Co.* v. *Huffman*,
28 Ind. 287; *Jeffersonville, etc., R. R. Co.* v. *Bowen*, 40
Ind. 545."  This language sounds more like an apology
than the decision of a great principle.

All the other cases decided by this court to which
we have been referred, named in the forepart of this
opinion, including the Bowen case in 40 Ind., the last
case cited in the foregoing quotation with certain ex-
ceptions hereinafter mentioned, are cases where the
parent sues for damages to him on account of loss of
services at common law or under the statute, and the
rule was correctly applied that his negligence in ex-
posing his child contributing to the injury defeated
his action, which has no influence whatever on the
question now before us.  But the marked distinction

between the two classes of cases was wholly lost sight of by this court in deciding the Huffman case and the Hathaway case. The observations of C. J. Beasley in discussing *Hartfield* v. *Roper, supra,* speaking for the supreme court of New Jersey, are so pertinent that we adopt them. "The problem is, whether an infant of tender years can be vicariously negligent, so as to deprive itself of a remedy that it would otherwise be entitled to. In some of the American states this question has been answered by the courts in the affirmative, and in others in the negative. To the former of these classes belongs the decision in *Hartfield* v. *Roper* reported in 21 Wend. 615. This case appears to have been one of first impression on this subject, and it is to be regarded, not only as the precursor, but as the parent of all the cases of the same strain that have since appeared.

"The inquiry with respect to the effect of the negligence of the custodian of the infant, too young to be intelligent of situations and circumstances, was directly presented for decision in the primary case thus referred to. * * * * It is obvious that the judicial theory was, that the infant was, through the medium of its custodian, the doer, in part, of its own misfortune, and that, consequently, by force of the well known rule, under such conditions, he had no right to an action. This, of course, was visiting the child for the neglect of the custodian, and such infliction is justified in the case cited in this wise: 'The infant,' says the court, 'is not *sui juris.* He belongs to another, to whom discretion in the care of his person is exclusively confided. That person is keeper and agent for this purpose; in respect to third persons his act must be deemed that of the infant; his neglects the infant's neglect.'

VOL. 151—4

The City of Evansville *v.* Senhenn.

"It will be observed that the entire context of this quotation is the statement of a single fact, and a deduction from it,—the premise being, that the child must be in the care and charge of an adult, and the inference being that, for that reason, the neglects of the adult are the neglects of the infant. But surely this is, conspicuously, a *non sequitur*. How does the custody of the infant justify, or lead to, the imputation of another's fault to him? The law, natural and civil, puts the infant under the care of the adult, but how can this right to care for and protect be construed into a right to waive, or forfeit any of the legal rights of the infant? The capacity to make such waiver or forfeiture is not a necessary, or even convenient, incident of this office of the adult, but, on the contrary, is quite inconsistent with it, for the power to protect is the opposite of the power to harm, either by act or omission. In this case in Wendell it is evident that the rule of law enunciated by it is founded in the theory that the custodian of the infant is the agent of the infant; but this is a mere assumption without legal basis, for such custodian is the agent, not of the infant, but of the law. If such supposed agency existed, it would embrace many interests of the infant, and could not be confined to the single instance where an injury is inflicted by the co-operative tort of the guardian. And yet it seems certain that such custodian cannot surrender or impair a single right of any kind that is vested in the child, nor impose any legal burden upon it. If a mother traveling with her child in her arms should agree with a railway company, that in case of an accident to such infant by reason of the joint negligence of herself and the company, the latter should not be liable to a suit by the child, such an engagement would be plainly invalid on two grounds—first, the contract would be *contra bonos*

*mores,* and, second, because the mother was not the agent of the child authorized to enter into the agreement. Nevertheless, the position has been deemed defensible, that the same evil consequences to the infant will follow from the negligence of the mother in the absence of such supposed contract, as would have resulted if such contract should have been made, and should have been held valid.

"In fact, this doctrine of the imputability of the misfeasance of the keeper of the child to the child itself, is deemed to be a pure interpolation into the law, for until the case under criticism it was absolutely unknown; nor is it sustained by legal analogies. Infants have always been the particular objects of the favor and protection of the law. In the language of an ancient authority this doctrine is thus expressed: 'The common principle is, that an infant in all things which sound in his benefit shall have favor and preferment in law as well as another man, but shall not be prejudiced by anything in his disadvantage.' 9 Vin. Abr. 374. * * * * Nothing could be more to the prejudice of an infant than to convert, by construction of law, the connection between himself and his custodian into an agency to which the harsh rule of *respondeat superior* should be applicable. The answerableness of the principal for the authorized acts of his agent is not so much the dictate of natural justice as of public policy, and has arisen, with some propriety, from the circumstances, that the creation of the agency is a voluntary act, and that it can be controlled and ended at the will of its creator. But in the relationship between the infant and its keeper, all these decisive characteristics are wholly wanting. The law imposes the keeper upon the child, who, of course, can neither control nor remove him, and the injustice, therefore, of making the latter responsible,

in any measure whatever, for the torts of the former, would seem to be quite evident. Such subjectivity would be hostile, in every respect, to the natural rights of the infant, and, consequently, cannot, with any show of reason, be introduced into that provision which both necessity and law establish for his protection. Nor can it be said that its existence is necessary to give just enforcement to the rights of others. When it happens that both the infant and its custodian have been injured by the co-operative negligence of such custodian and a third party, it seems reasonable, at least in some degree, that the latter should be enabled to say to the custodian, you and I by our common carelessness, have done this wrong, and therefore, neither can look to the other for redress; but when such wrongdoer says to the infant, your guardian and I, by our joint misconduct, have brought this loss upon you, consequently you have no right of action against me, but you must look for indemnification to your guardian alone, a proposition is stated that appears to be without any basis either in good sense or law. The conversion of the infant, who is entirely free from fault, into a wrongdoer, by imputation, is a logical contrivance uncongenial with the spirit of jurisprudence. The sensible and legal doctrine is this, an infant of tender years cannot be charged with negligence; nor can he be so charged with the commission of such fault by substitution, for he is incapable of appointing an agent, the consequence being that he can, in no case, be considered to be the blamable cause, either in whole or in part, of his own injury. There is no injustice, nor hardship, in requiring all wrongdoers to be answerable to a person who is incapable either of self protection or of being a participator in their misfeasance.

"Nor is it to be overlooked that the theory here re-

pudiated, if it should be adopted, would go the length of making an infant in its nurse's arms answerable for all the negligences of such nurse while thus employed in its service.   *   *   *   *   If the neglects of the guardian are to be regarded as the neglects of the infant, as was asserted in the New York decision, it would, from logical necessity, follow, that the infant must indemnify those who should be harmed by such neglects.  That such a doctrine has never prevailed is conclusively shown by the fact that in the reports there is no indication that such a suit has ever been brought.

"It has already been observed that judicial opinion, touching the subject just discussed, is in a state of direct antagonism, and it would, therefore, serve no useful purpose to refer to any of them.  It is sufficient to say, that the leading text writers have concluded that the weight of such authority is adverse to the doctrine that an infant can become, in any wise, a tortfeasor by imputation.  1 Shearm. & R., Neg. 75; Whart. Neg., section 311; 2 Wood Railway Law, p. 1284." *Newman* v. *Phillipsburgh Horse Car R. R. Co.*, 52 N. J. L. 446, 8 L. R. A. 842.

In the states of Alabama, Connecticut, Pennsylvania, North Carolina, Tennessee, Texas, Georgia, Vermont, Louisiana, Virginia, Maryland, Michigan, Mississippi, New Hampshire, Iowa, Illinois, Missouri, Nebraska, Ohio, New Jersey, and perhaps others, the doctrine of *Hartfield* v. *Roper* has been distinctly repudiated.  The supreme court of North Carolina says: "The imputation of the negligence of parents and guardians to children of tender age is, says Shearman & Redfield (Vol. 1, 74), an invention of the supreme court of New York in the   *   *   case of *Hartfield* v. *Roper*, 21 Wend. 615, and has been followed in many of the decisions of that state, although it is said

by these authors to be founded upon a *dictum*, which has only been assumed to be the law by the court of last resort, but never squarely presented to that tribunal for decision. And they further remark that it may well be doubted whether the question has ever been fully argued anywhere, and that the result of their examination of the cases is to satisfy them 'that the last of the long series of so called decisions on this point is like the first, a mere *dictum*, uttered without hearing argument, and without consideration.'" *Bottoms* v. *Seaboard, etc., R. R. Co.*, 114 (N. C.) 699, 25 L. R. A. 784.

In reviewing the case of *Hartfield* v. *Roper, supra,* Mr. Beach says, that the doctrine, as applied to children too young to exercise discretion, is an anomaly, and in striking contrast with the case of a donkey which is carelessly exposed in the highway, and negligently run down and injured, and also with the case of oysters carelessly placed in the bed of a river, and injured by the negligent operation of a vessel, in both of which cases actions have been maintained. And he forcibly observes that under the principle referred to, the child, were he an ass or oyster, would secure a protection which is denied him as a human being of tender years. Beach Contrib. Neg., section 415. This author in his examination of the doctrine, remarks: "It is not true that an infant is not *sui juris*. In the sense of being entitled to maintain an action for his own benefit he is *sui juris*. As far as his right of action is concerned he is in no respect the chattel of his father. * * * The judgment [when suing by guardian or next friend] if any is recovered, is the property of the minor." Beach Contrib. Neg. (2d ed.) section 128. The supreme court of Illinois was classed by text writers and other courts as was Indiana, as holding to the doctrine of *Hartfield* v.

*Roper.* But the supreme court of Illinois in *Chicago, etc., R. W. Co.* v. *Wilcox*, 138 Ill. 370, after reviewing twelve Illinois decisions decided in 1891 against the rule in *Hartfield* v. *Roper* and said: "It seems to be assumed by several of the writers on the subject that this court is committed to the doctrine that in a suit by a child to recover damages caused by the negligence of the defendant, the negligence of the plaintiff's parents or custodians may be imputed to the plaintiff in support of the defense of contributory negligence. While there is in some of the cases some foundation for this assumption, yet in our opinion, the question has never been so considered or determined by this court as to make it the settled rule in this state. Most of the cases to which reference is made as supporting said doctrine were suits brought by a parent in his own right or as the legal representative of the child, where the death of the child was alleged to have been caused by the negligence of the defendant." After reviewing the Illinois cases, that court goes on to say: "It is apparent that in none of the cases above mentioned was there any occasion for the court to determine whether, as a rule of law, the negligence of the plaintiff's parents or custodian would sustain the defense of contributory negligence, nor is there any attempt in any of them to consider or discuss the rule. In several of them language is used which would seem to imply a tacit recognition of the doctrine of imputed negligence, but in none of them was the adoption of that doctrine essential to the decision, nor can we suppose from the language used that the court intended to commit itself definitely to an affirmance of that doctrine."

The rule denying the doctrine of imputed negligence is now recognized and enforced by the courts of many of the states, and is supported by the rea-

soning and authority of text writers whose opinions are justly entitled to a high degree of consideration. Among them may be mentioned Mr. Bishop, who in his recent treatise of Noncontract Law (section 582), says: "This new doctrine of imputed negligence, whereby the minor loses his suit, not only where he is negligent himself, but where his father, grand-mother, or mother's maid is negligent, is as flatly in conflict with the established system of the common law as anything possible to be suggested. The law never took away a child's property because his father was poor, or shiftless or a scoundrel, or because any-body who could be made to respond to a suit for dam-ages was a negligent custodian of it. But, by the new doctrine, after a child has suffered damages, which confessedly, are as much his own as an estate con-ferred upon him by gift, and which he is entitled to obtain out of any one of several defendants who may have contributed to them, he cannot have them if his father, grandmother, or mother's maid happens to be the one making the contribution. In these and other respects, it is submitted, the established principles stated in a preceding section are conclusive of the proposition that the doctrine now in contemplation does not belong to the common law." To the same effect see Wharton Neg., section 314 *et seq.;* Beach on Contrib. Neg. sections 38-48.

The supreme court of Georgia, in *Atlanta, etc., R. W. Co.* v. *Gravitt,* 93 Ga. 369, 26 L. R. A. 553, in an able opinion condemning *Hartfield* v. *Roper,* and speaking of this Illinois case, says: "In many of the text-books it is stated that the opposite view prevails in Illinois, and numerous decisions of the supreme court of that state are cited in support of this statement—seem-ingly with good reason. Be this as it may, however, that state, by its recent decisions, has 'wheeled into

line,' and joined the procession of those jurisdictions which have repudiated the doctrine of *Hartfield* v. *Roper*."

Iowa was also classed as one of the states holding to the doctrine of *Hartfield* v. *Roper* until *Wymore* v. *Mahaska County*, 78 Iowa 396, 6 L. R. A. 545, was decided in 1889. In that case the Iowa cases were reviewed, and it was held that the previous decisions of that court had assumed, without deciding, that the true doctrine was that of *Hartfield* v. *Roper*, but in this latter decision the court distinctly and emphatically repudiated that doctrine.

We therefore conclude that these authorities announce and declare the only correct rule of law upon the subject, and hence the cases of *Lafayette, etc., R. R. Co.* v. *Huffman*, 28 Ind. 287, and *Hathaway* v. *Toledo, etc., R. W. Co.*, 46 Ind. 25, in so far as they conflict with the conclusion here reached, are overruled. It follows that the court did not err in refusing the thirteenth instruction.

One of the cases decided by this court and cited by appellant's counsel as sustaining the doctrine of *Hartfield* v. *Roper* is *Louisville, etc., R. W. Co.* v. *Shanks*, 132 Ind. 395. But that case does not so decide, but simply assumes that doctrine to be the law, both parties seeming to concede that such was the law.

Another one of the list of cases cited by appellant calling for special mention is that of *Indianapolis, etc., R. W. Co.* v. *Wilson*, 134 Ind. 95. The complaint was held bad in that case because it showed that the plaintiff, a boy nine years of age, was guilty of contributory negligence, notwithstanding its general averment that he was free from contributory negligence, the complaint having proceeded on the theory that he had sufficient age and discretion to be chargeable with negligence. No question about the imputabil-

ity of negligence is hinted at in the case, much less decided.

The only other case in the list cited by appellant not embraced in the class where the parent sues as parent for the death of the child under the statute or at common law for loss of services is *Cleveland, etc., R. W. Co.* v. *Keely*, 138 Ind. 600. No question of the imputability of the negligence of the parents or custodians was involved or decided in that case. The plaintiff was a boy, who was eleven years old when the injury occurred, suing by next friend. This court in answer to the objection that the complaint did not allege due care on part of the boy's parents, observed: "The appellee in this case is suing for his own injury. He was himself capable of going to school across the railroad, and his parents are not in the case, nor is it necessary that they should be."

The refusal of two other instructions is complained of by the appellant, reading as follows: "Seven. If at the time of the injuries complained of, the defendant had a contract with any person to furnish it with lumber by the year or otherwise, and to deliver the same to the city, and such person did in fact under such contract, deliver said lumber and pile the same in the street, then the act of such person or persons in delivering and piling the same was not the act of the city, and the city would not be liable for any negligence of such person in placing the same in the street, unless it had notice thereof, either express or implied." "Twelfth. If the lumber mentioned in the complaint was not placed in the street by the city, but was placed there by some one else, to be used in the construction or repair for a building, or for any other purpose, then the city is not liable for any accident resulting therefrom unless it had notice either express or implied, that the same was in the street,

The City of Evansville *v.* Senhenn.

and that the same was in an unsafe and dangerous condition."

The first paragraph of the complaint proceeded upon the theory, that the city itself placed the lumber in the street, and the second that it suffered it to exist after notice. There was evidence from which the jury might have inferred that the lumber was piled in the street by sawmill men with whom the city had a contract for its purchase and delivery. There was also evidence from which the jury might have inferred that the lumber belonged to private persons, to be used in the erection of a dwelling house, and with which the city had no connection whatever. The difficulty in determining the particular purpose for which and by whom the lumber was put in the street was greatly enhanced by the great length of time that had elapsed between the act and the bringing of the suit, being about twenty years. But if the city purchased lumber from outside parties, and such parties in delivering it, wrongfully piled it in the street, such vendor of the lumber in delivering it to the city was not the agent of the city, and the city was not liable for such act. The general rule is that a municipal corporation is not responsible for the negligence of an independent contractor with such corporation. *Leeds* v. *City of Richmond*, 102 Ind. 372; 2 Dillon Mun. Cor. (4th ed.) 1082. But, as was held in the former opinion in this case, a city which suffers an obstruction or cause of danger to remain for an unreasonable length of time upon its streets or sidewalks, so that the city might be presumed to have notice of the obstruction, would be liable therefor to the same extent as if the city had itself placed the obstruction or danger there in the first instance. *Glantz* v. *City of South Bend*, 106

Ind. 305; *Bullock* v. *Mayor, etc.*, 99 N. Y. 654, 2 N. E. 1 and notes.

Both of the instructions seven and twelve involve the principle of the necessity of notice to the city, express or implied, of the existence of the obstruction or danger, where the same has not been made by the city or some of its agents. As was said by this court in *City of Fort Wayne* v. *DeWitt*, 47 Ind. 397, borrowing from Dillon on Mun. Cor., sections 789, 790 (2d ed.) "The ground of the action is either positive misfeasance on the part of the corporation, its officers, or servants, or by others under its authority, in doing acts which cause the street to be out of repair, in which case no other notice to the corporation of the condition of the street is essential to its liability, or the ground of action is the neglect of the corporation to put the streets in repair, or to remove obstructions therefrom, or to remedy causes of danger occasioned by the wrongful acts of others, in which cases notice of the condition of the street, or what is equivalent to notice, is necessary, as will presently be stated, to give to the person injured a right of action against the corporation, unless, indeed, the matter be otherwise regulated by statute * * * *. Where the duty to keep its streets in safe condition rests upon the corporation, it is liable for injuries caused by its neglect or omission to keep the streets in repair, as well as for those caused by defects occasioned by the wrongful acts of others. But, as in such case, the basis of the action is negligence, notice to the corporation of the defect which caused the injury, or facts from which notice thereof may reasonably be inferred, or proof of circumstances from which it appears that the defect ought to have been known and remedied by it, is essential to liability; for in such cases the corporation, in the absence of controlling enactment, is

The City of Evansville v. Senhenn.

responsible only for a reasonable diligence to repair the defect or prevent accidents after the unsafe condition of the street is known, or ought to have been known, to it, or its officers having authority to act respecting it." To the same effect is *Higert* v. *City of Greencastle*, 43 Ind. 574. According to these principles, the circuit court erred in refusing to give instructions seven and twelve asked by the appellant.

The giving and refusing of other instructions are complained of, but what we have already said covers about all the vital questions involved in such other instructions. The circuit court erred in overruling the motion for a new trial. The judgment is reversed, and the cause remanded with instructions to grant a new trial.

## On Petition for Rehearing.

McCabe, J.—A very earnest petition for a rehearing, supported by a very elaborate brief, is presented in this case.

The first fault found with the original opinion is that we stated therein that the venue was changed from Vanderburgh to Warrick county before the first trial. We hasten to cheerfully correct the error, if error it is, by saying that the statement of appellee's counsel is probably correct to the effect that the first trial took place in the superior court of Vanderburg county, resulting in a judgment in favor of the defendant. After the reversal of this judgment the cause was remanded to the trial court, and the venue was then changed to the Warrick Circuit Court. If we were "in error" in this statement, as counsel says we were, we were excusable, because the record shows that the first trial that it gives any account of took place in the Warrick Circuit Court. We certainly ought not to be criticised for strictly follow-

ing the record, especially in the absence of any infor-
mation from the learned counsel that it does not
speak the truth.   Nor do we mean to intimate that
we could accept the statement of counsel, in conflict
with the record if the point was material.

Appellee's learned counsel, in support of the pe-
tition for a rehearing, says, that: "It is not our pur-
pose to controvert any of the rules of law laid down
by this court in its decision in this case.   We believe,
upon the other hand, that the law is correctly stated,
and we have at no time contended for a different
statement."   And counsel proceeds to favor us with
twenty-four printed pages of a brief in support of ap-
pellee's petition for a rehearing.   And in the very next
statement in his brief, counsel, as to instructions seven
and twelve, for the refusal of which we reversed the
judgment, says that, "both instructions seven and
twelve are contrary to the law."   This, at least,
seems a little difficult to understand.   The principal
defense made of the court's refusal to give instruc-
tion twelve is that it was substantially given and suffi-
ciently embraced in instruction number fifteen, given
by the court to the jury.   We would be fully justified in
refusing to consider this point in support of appellee's
petition for a rehearing, because no such defense of
the refusal of that instruction was made by appellee's
counsel prior to the petition for a rehearing.   It has
often been decided by this court that a point made
for the first time on a petition for a rehearing that
might have been made before, is not entitled to no-
tice.   The correct and orderly administration of jus-
tice requires such a rule.   Points must be made in
the briefs filed before the decision of the cause, if
they are to be noticed on a petition for a rehearing.
Glittering generalities will not do in the place of
points.   But in this case there was not a word said,

prior to the petition for a rehearing, about instruction fifteen given by the court embracing the substance of the proposition couched in instruction twelve refused by the court, as a justification or a defense of the court's refusal of instruction twelve. The correct administration of justice does not require this court to search a voluminous record to discover some matter which might tend to establish that an erroneous refusal of an instruction was rendered harmless, when the party to be benefited by such discovery is represented in this court by able counsel with a voluminous brief, wherein no effort is made to point out such matter or mention the same. Under such circumstances this court is justified in presuming that no such matter exists. However, we are inclined to think that the court's refusal of said instruction twelve was justified, on the ground that the same was substantially given in the fifteenth instruction. But there is no way of justifying the refusal of the seventh instruction, except that it is not the law as applied to the evidence. Appellee's counsel has attempted to justify the refusal of that instruction, both on the ground that it does not express the law, and that it was not applicable to the evidence, and that the evidence was not sufficient to establish the fact upon which it is based. We quote the instruction again: "If, at the time of the injuries complained of, the defendant had a contract with any person to furnish it with lumber by the year, or otherwise, and to deliver the same to the city, and such person did in fact, under such contract, deliver said lumber, and pile the same in the street, then the act of such persons in delivering and piling the same was not the act of the city, and the city would not be liable for any negligence of such person in placing the same in the street, unless it had notice thereof either ex-

press or implied." Great stress is put upon the word "deliver," as used in this instruction. It is contended that there could be no such thing as a delivery of the lumber, without an acceptance thereof by the city, and many definitions of the word "deliver" in cases of contracts for delivery of goods or things are cited. Many of them are to the effect that a delivery implies an acceptance, and hence an act of the will, and hence knowledge on the part of the party to whom delivery is made.

There are many definitions to the word "deliver." What particular meaning among its many definitions is to be assigned to the word depends on the connection in which it is used. The fourth definition given to it by Webster is: "To give forth in action or exercise; to discharge; as to deliver a broadside or a ball." That is the same meaning the word has in the sentence, "To deliver the opinion," "To deliver an address." The word used in such a connection does not imply an act of the will on the part of some one else, nor an acceptance of anything. Such was the sense in which it was evidently used in instruction seven, as clearly indicated in the sentence reading: "And the city would not be liable for any negligence of such person in placing the same in the street, unless it had notice thereof, either express or implied." If the court meant by the word "deliver," in the previous part of the instruction, to imply an acceptance by the city, then there would have been no sense and no meaning in the words "unless it had notice thereof express or implied." This is so because the city could not accept the lumber in a pile on the street without notice that it was there. The word "deliver" in the instruction evidently was intended to mean the same that the word "placing" in the sentence above quoted from the instruction was intended to mean. Appel-

The City of Evansville v. Senhenn.

lee's counsel does not question the plain meaning of these words, "and the city would not be liable for any negligence of such person in placing the same in the street, unless it had notice thereof, either express or implied," nor that they express the law by themselves correctly, but the contention is that the use of the word "deliver" in the previous part of the instruction changes the meaning of these words. But we have shown that one of the meanings of the word "deliver" is synonymous with the sense in which the word "place" was used in the instruction. But we need not descend into a technical definition of every word in the instruction. The meaning of the whole could not be misunderstood by the jury or anyone else. It told them in substance, that if the persons from whom the city purchased the lumber in question piled it in the street without notice to the city, express or implied, that it was so piled, the act of placing the lumber in the street was not the act of the city, and it was not liable therefor. Other instructions given by the court properly directed the jury as to when the city would become liable if such lumber pile, so wrongfully placed in the street without notice to it, by leaving it there an unreasonable length of time. In addition to the cases cited in the original opinion that the instruction correctly expressesd the law, we note a case cited by appellee's counsel in support of the petition for a rehearing, namely, *Wabash, etc., R. W. Co. v. Farver*, 111 Ind. 195. This case directly and emphatically upholds the correctness of the refused instruction seven.

It is next contended that because it turned out on the trial that the contract the city had with the sawmill men for the purchase of lumber was in writing, and oral evidence of its particular terms was excluded

VOL. 151—5

on objection by appellee's counsel, therefore we must treat the case as if there had been no proof upon the subject. There was enough evidence to show that the city had purchased the lumber, and that it was hauled by the sawmill men to the city. At least the evidence was sufficient to warrant the jury in so inferring. This was sufficient to show the nature of the transaction, and to show that the relation of master and servant did not exist between the city and the sawmill men, and hence the city would not be liable for their negligence in .piling the lumber in the street, unless it had notice, express or implied, of such negligent act, or suffered it to remain there an unreasonable length of time. *Wabash, etc., R. W. Co.* v. *Farver, supra.* If there was anything in the particular terms of the contract between the city and the sawmill men tending to establish a different relation, or tending to show the relation of master and servant between the city and the sawmill men, then the appellee's counsel ought to have introduced such evidence. The evidence that was introduced was sufficient, *prima facie*, to warrant the jury in drawing the inference that no such relation as master and servant existed between the sawmill men and the city, and authorized them to infer that the only relation existing between them was that of buyer and seller, making the sawmill men independent contractors with the city. The jury were the judges of the evidence, and on them devolved the duty of determining whether the evidence was sufficient to establish that relation, and the duty devolved on the court of telling them what the law was in case they concluded that the evidence did establish that relation.

The nature of the transaction, as disclosed by the evidence already alluded to, makes a much stronger case than *Wabash, etc., R. W. Co.* v. *Farver, supra,*

relied on by appellee, for the application of the doc-
trine that, in case of the relation of independent con-
tractor there is no liability on the part of one of the
contracting parties for the negligent acts of the other
in carrying out the contract, where it does not neces-
sarily create a nuisance. The facts on which that de-
cision was made were that the railway company was
engaged in constructing a well or reservoir to supply
a water station on the line of its road near Auburn,
Indiana. Running water interfered with the work,
and it became necessary to cause the accumulating
water to be pumped out of the way, so as to prevent
it from running into the well or reservoir which was
in process of construction. The construction of the
well and laying pipes thence to the water station, had
been committed to the charge of a Mr. Kress, an em-
ploye of the railway, who, with a force of men under
his control, was engaged in providing means to supply
the station with water. Williams, who resided in or
near Auburn, was the owner of a small, portable
steam engine, which he was accustomed to employ in
sawing wood, threshing grain, pumping water and the
like, as opportunity offered. He contracted with
Kress, for a stipulated *per diem*, to furnish and oper-
ate his engine in pumping, at such times as might be
necessary, in order to keep the water from interfering
with the work which the latter was constructing.
Williams agreed to furnish his engine and personally
superintend the running of it, and to provide and
pay for such assistance as he needed in keeping the
water from obstructing the progress of the work. If
it became necessary that he should run the engine at
night he was to receive extra compensation. In pur-
suance of the agreement the latter placed his engine
in a vacant lot, some six feet or more outside the line
of a public highway, which intersected the railway

company's line at or near the point where the reservoir was being constructed. So far as appears, he selected the location of the engine, and controlled its operation, as the work he engaged to do required. While he was thus engaged in carrying out his agreement, the plaintiff's horse, in passing along the adjacent highway, took fright at the engine and became unmanageable. The plaintiff was thrown from the carriage and injured. He recovered a judgment in the trial court, and in reversing the judgment on the facts above stated, Mitchell, J., speaking for the court, said: "The question is, whether, under the circumstances, the railway company is liable for the negligence of Williams, assuming that he was negligent in operating his engine so near the public highway. The rule which controls in cases of this class has become well established, and has more than once been recognized and applied by this court. *Ryan* v. *Curran*, 64 Ind. 345, 31 Am. Rep. 123; *Sessengut* v. *Posey*, 67 Ind. 408, 33 Am. Rep. 98; *City of Logansport* v. *Dick*, 70 Ind. 65, 36 Am. Rep. 166. Under this rule, where work which does not necessarily create a nuisance, but is in itself harmless and lawful when carefully conducted, is let by an employer, who merely prescribes the end, to another, who undertakes to accomplish the end prescribed by means which he is to employ at his discretion, the latter is, in respect to the means employed, the master. If, during the progress of the work, a third person sustains injury by the negligent use of the means employed and controlled by the contractor, the employer is not answerable. The inquiry in such case is, did the relation of master and servant subsist between the person for whom the work was done, and the person whose negligence occasioned the injury? * * * * The work contracted to be done was not in itself unlawful, nor was

The City of Evansville v. Senhenn.

it necessarily a nuisance to operate a portable steam-engine in a careful manner in close proximity to a public highway. Injury could only result from its negligent use." And the judgment was reversed on the evidence because it failed to show that the relation of master and servant subsisted between the railway and Williams, the owner and operator of the portable steam engine, and hence the railway was not liable for his negligence.

But the rule there laid down is much more applicable to the evidence here, because it clearly indicates that the only relation existing between the city and the sawmill men was that of buyer and seller, and not that of master and servant. And there being enough evidence to warrant and require the submission of the question of fact to the jury as to the true relation subsisting between the sawmill men and the city, the appellant had a right to demand an instruction stating what the law was in case the jury found that the relation was not that of master and servant, but was merely that of buyer and seller. If they found that to be the relation, appellant had a right to an instruction that the negligent acts of the seller were not chargeable to the buyer. That the refused instruction seven would have done.

Another contention why the instruction was properly refused, is that the evidence was wholly insufficient to establish that there was any contractor in the case. But such contention assumes that it is the duty of the trial judge to determine that issue, as well as all other issues, in advance of the submission of the case to the jury, and if he thinks the evidence insufficient, after carefuly weighing it, *pro* and *con*, he need not submit it to the jury. But that is very far from the legal duty of the trial judge. If there is any evidence sufficient to warrant the jury in drawing the

inference that a certain fact exists pertinent to the issues, it is the duty of the trial judge, especially if requested, to instruct the jury what the law arising from such fact is, even though he may be of opinion that such fact is not established by a preponderance of the whole evidence. Otherwise a trial of the facts by a jury could take place only in empty form, but not in truth and in reality. Under such a rule no question of fact could be submitted to the jury until the trial judge had decided that the preponderance of the evidence had established the fact.

We are constrained to hold that the trial court erred in refusing to give instruction seven, and therefore the petition for rehearing ought to be, and is, overruled.