FILED

Nov 18 2016, 9:56 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



ATTORNEYS FOR APPELLANTS

Kelly J. Pitcher
Adam R. Doerr
Clendening Johnson & Bohrer, P.C.
Indianapolis, Indiana

ATTORNEY FOR APPELLEE

C. Dennis Wegner
C. Dennis Wegner & Assoc.,
Pro.Corp.
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Jane E. Wilson, M.D., and IU Medical Group, | November 18, 2016 |
| *Appellants*, | Court of Appeals Case No. 49A05-1511-CT-1814 |
| v. | Appeal from the Marion Superior Court |
| Tyler Lawless b/n/f Mindy R. Lawless, | The Honorable James B. Osborn, Judge |
| *Appellee*. | Trial Court Cause No. 49D14-1312-CT-43325 |

**Brown, Judge.**

[1] Jane E. Wilson, M.D., and the IU Medical Group ("IU," and together with Wilson, the "Appellants") appeal the trial court's judgment in favor of Tyler Lawless on a complaint for damages filed by Tyler's mother Mindy Lawless as Tyler's next friend. The Appellants raise two issues which we consolidate and restate as whether the trial court's judgment is clearly erroneous. We affirm.

## Facts and Procedural History

[2] The relevant facts are not in dispute. On October 9, 2008, Mindy brought Tyler, who was ten years old at the time, to see Dr. Wilson because Tyler was vomiting and had a fever. Dr. Wilson filled in for Tyler's regular physician, Dr. David Porter, who was not available that day. Dr. Wilson noted that Tyler had undergone a percutaneous kidney biopsy ten days before and that he was experiencing symptoms of fever, vomiting, and diarrhea. Dr. Wilson accessed a medical website to refresh her knowledge regarding common complications from percutaneous kidney biopsies, which are bleeding and infection, the symptoms of which are flank or abdominal pain. Vomiting is a less common symptom of kidney biopsy complications, and diarrhea is not a symptom of complications. Dr. Wilson ordered a urinalysis to check for possible biopsy complications, which showed no signs of bleeding or infection. She examined Tyler's abdominal area to see if he had any flank or abdominal pain and determined that he did not.

[3] Dr. Wilson believed that Tyler's condition was not related to the kidney biopsy and instead diagnosed him with viral gastroenteritis.[1] She did consider other, less common complications from kidney biopsies, such as hydronephrosis,[2] but she ruled it out because Tyler was not experiencing flank pain. Dr. Wilson did not order an ultrasound or sonogram, which would have revealed that Tyler suffered a urinoma from the biopsy.

[4] At the visit Mindy played a voicemail message from Dr. Jeffrey Leiser, the doctor who performed the biopsy on Tyler. Dr. Wilson believed based thereon that Tyler was going to be seen by Dr. Leiser for follow up to the biopsy.[3] Dr. Wilson wrote Tyler a prescription for Zantac and gave instructions to "return for new or concerning symptoms or persistent fever." Exhibit 1 at 57. Dr. Wilson did not contact Dr. Leiser's office to confirm whether Tyler had a follow up appointment scheduled. Mindy did not obtain a follow up appointment with Dr. Leiser's office or another doctor.

---

[1] The Mayo Clinic's website notes that viral gastroenteritis is commonly known as the stomach flu. *See Viral gastroenteritis (stomach flu)*, MAYO CLINIC, http://www.mayoclinic.org/diseases-conditions/viral-gastroenteritis/basics/definition/con-20019350 (last visited Sept. 16, 2016).

[2] The National Kidney Foundation's website states that "Hydronephrosis is the swelling of a kidney due to a build-up of urine. It happens when urine cannot drain out from the kidney to the bladder from a blockage or obstruction." *See Hydronephrosis*, NATIONAL KIDNEY FOUNDATION, https://www.kidney.org/atoz/content/hydronephrosis (last visited Sept. 30, 2016).

[3] According to the court's Judgment, Dr. Leiser documented the voicemail as follows: "Biopsy revealed thin glomerular basement membrane disease. Generally not associated with progressive kidney disease. No medications or activity limitations. Will need periodic follow-up, e.g., annually. Call to leave me a contact number and time." Appellants' Appendix at 30.

[5] Following the appointment with Dr. Wilson, Tyler continued to vomit at least once a week. Around December 2008 he began having flank pain, which is the most common symptom of a kidney biopsy complication and the most common symptom of a kidney obstruction. Mindy gave Tyler acetaminophen almost every day for his flank pain. On January 22, 2009, she brought Tyler to see Dr. David Kosten with Sunshine Pediatrics for his vomiting, which had become more frequent during the previous week, and flank pain. At the visit, Dr. Kosten noted that he did not believe Tyler's symptoms were related to his kidney disease, and he referred Tyler to pediatric gastroenterology.

[6] On March 30, 2009, Dr. Mark Corkins saw Tyler at the Riley Hospital pediatric gastroenterology clinic, and Mindy reported that Tyler was vomiting one to two times per week and complained that his hips hurt. Dr. Corkins ordered a number of tests including an abdominal ultrasound, revealing that Tyler had urinoma, which is a collection of urine outside of the ureter and is a rare complication of a percutaneous kidney biopsy. The urinoma gradually increased in size until it obstructed the kidney, causing an obstructive nephropathy. On May 5, 2009, Tyler had his left kidney removed due to the obstructive nephropathy.

[7] On December 3, 2013, Tyler by next friend Mindy filed a complaint alleging that the Appellants failed to meet the applicable standard of care in treating Tyler when Dr. Wilson examined him on October 9, 2008, causing the loss of his kidney. On January 29, 2014, the Appellants filed an answer pleading the affirmative defenses of contributory negligence and failure to mitigate damages.

On July 24, 2015, the parties submitted trial briefs, and the Defendants' brief argued that Tyler's "recovery is barred by the doctrine of contributing negligence and/or by the subsequent intervening and superseding negligence of Ms. Lawless."  Appellants' Appendix at 23.

[8]  The court commenced a bench trial on July 27, 2015.  Dr. Wilson testified that "a uroma [] was slowly, slowly developing over time" around Tyler's kidney and that the obstruction likely developed in December when Tyler began developing flank pain.  Transcript at 270.  Dr. Wilson testified that, although she advised Mindy to bring Tyler back for a follow up if he "should worsen or fail to improve," she did not specifically instruct Mindy to bring Tyler back if he continued vomiting.  *Id.* at 262.  She also did not advise Mindy that Tyler could have a renal obstruction and that continued vomiting could be a symptom of a renal obstruction.

[9]  On October 8, 2015 the court entered its judgment (the "Judgment") in favor of Tyler containing findings of fact consistent with the foregoing and conclusions of law.  The Judgment stated in part:

## FINDINGS OF FACT

\* \* \* \* \*

28.  It was Dr. Wilson's understanding from listening to the voice mail message and from her recollection of talking to Mindy that Mindy intended to return Dr. Leiser's call and confirm a follow up visit on Monday or Tuesday of the following week.  Mindy denies that she had a conversation about a future appointment with Dr. Leiser with Dr. Wilson.  The Court places greater

weight on Mindy's testimony because Dr. Leiser had not scheduled a follow up visit and Mindy was seeing Dr. Wilson because Mindy was dissatisfied with Dr. Leiser.

\* \* \* \* \*

Expert Opinion

59.  Pediatrician Robert Chabon, M.D., J.D., (hereinafter "Dr. Chabon") was retained by the Plaintiff to offer expert testimony.

\* \* \* \* \*

68.  Dr. Chabon has both observed and performed percutaneous renal biopsies.

69.  After reviewing Tyler's medical records, Dr. Chabon concluded that Dr. Wilson's treatment of Tyler did not comply with the standard of care because Dr. Wilson failed to take a complete medical history and failed to either confirm a follow up appointment with Dr. Leiser or schedule a follow up within 24 to 48 hours with herself or Dr. Porter.

\* \* \* \* \*

71.  The Court found Dr. Chabon's testimony and opinion to be of great value.  He has abundant expertise in pediatrics both as a practicing physician and as a teaching physician.  His testimony was clear, substantial, detailed, and credible.

72.  In addition to Dr. Chabon, Plaintiff retained nephrologist Douglas Johnstone, M.D., J.D. (hereinafter "Dr. Johnstone").

\* \* \* \* \*

76. Dr. Johnstone is not a pediatrician. He does not practice pediatrics in an office setting like Dr. Wilson. He is not familiar with the standard of care for pediatricians.

77. Dr. Johnstone once opined that Dr. Wilson did not meet the standard of care because she either failed to make certain that there was a follow up appointment with Dr. Leiser or failed to order an ultrasound.

78. Dr. Johnstone also opined that if Dr. Wilson understood that Tyler was planning to follow up with Dr. Leiser, Dr. Wilson would have complied with the standard of care.

79. Because of his lack of familiarity with the standard of care for pediatricians and his shifting positions on whether Dr. Wilson met the standard of care, Dr. Johnstone's testimony was of little value.

80. The three physicians on the Medical Review Panel found that Dr. Wilson complied with the standard of care – Mona Zawaideli, M.D., a pediatric nephrologist, Theresa Travis, M.D. (hereinafter "Dr. Travis"), a doctor of nephrology and internal medicine, and Thomas Padgett, M.D. (hereinafter "Dr. Padgett"), a pediatrician.

* * * * *

82. While serving on the Medical Review Panel, Dr. Travis deferred to Dr. Padgett's knowledge of the standard of care for a pediatrician because it was not her area of expertise.

83. In reviewing Dr. Wilson's notes on Tyler, Dr. Travis believed that Dr. Wilson had not considered hydronephrosis as a possible diagnosis because Dr. Wilson had made no note to that effect.

84. Dr. Travis concluded that, if Dr. Wilson did indeed consider hydronephrosis as a diagnosis, Dr. Wilson should have gotten an ultrasound for Tyler to meet the standard of care.

85. No evidence was presented questioning whether Dr. Travis was biased. The Court found Dr. Travis's testimony to be clear, specific, and credible.

86. The Court now finds that Dr. Travis would not have deferred to Dr. Padgett on the standard of care had she known that Dr. Wilson considered hydronephrosis as a differential diagnosis.

87. Dr. Padgett is a board certified pediatrician with a medical degree from Indiana University School of Medicine and pediatric residency.

88. Dr. Padgett has been in private pediatric practice since 1985.

89. Dr. Padgett is familiar with the standard of care for pediatricians in circumstances similar to that of Dr. Wilson.

90. Dr. Padgett opined that Dr. Wilson's plan complied with the standard of care.

91. The Court accords some weight to Dr. Padgett's opinion, given his lengthy history of practice in pediatrics. However, Dr. Padgett's testimony was confusing and often incoherent. Dr. Padgett seemed to be deliberately failing to understand the questions of Plaintiff's counsel, often struggling with the meaning of relatively easy to understand terms. Unlike Dr. Chabon and Dr. Travis, Dr. Padgett did not give a substantial factual and reasonable basis for his opinion. The Court considered that Dr. Padgett might not have had Dr. Chabon's experience testifying, but even accounting for nervousness in an unfamiliar role, Dr. Padgett's testimony remained unconvincing.

## CONCLUSIONS OF LAW

1. Medical malpractice cases are governed by a modified version of traditional negligence law. In a negligence action, a plaintiff bears the burden of proving that there is "1) a duty on the part of the defendant to conform his conduct to a standard of care arising from his relationship with the plaintiff, (2) a failure of the defendant to conform his conduct to the requisite standard of care required by the relationship, and (3) an injury to the plaintiff proximately caused by the breach." *Webb v. Jarvis*, 575 N.E.2d 992, 995 (Ind. 1991)[, *reh'g denied*].

2. A physician's duty to conform his or her conduct to the standard of care arises from the physician-patient relationship. *Miller v. Martig*, 754 N.E.2d 41, 46 (Ind. Ct. App. 2001). A physician-patient relationship existed between Dr. Wilson and Tyler Lawless.

3. Indiana has a special standard of care that doctors must follow. The doctor "must exercise that degree of care, skill, and proficiency exercised by reasonably careful, skillful, and prudent practitioners in the same class to which he belongs, acting under the same or similar circumstances." *Vergara by Vergara v. Doan*, 593 N.E.2d 185, 187 (Ind. 1992).

4. Dr. Wilson did not comply with the standard of care because she took an incomplete medical history and failed either to order a sonogram or ultrasound to rule out renal biopsy complications or to confirm that a follow up visit with Dr. Leicer [sic] was scheduled.

5. Dr. Wilson made a reasonable initial diagnosis based upon the symptoms Tyler presented. Tyler was experiencing vomiting, diarrhea, and low grade fever. These are all regular symptoms of a prevalent disease known as viral gastroenteritis. Vomiting is the only one of these symptom [sic] that would point to a biopsy complication. Vomiting, however, is much less common than the normal biopsy complication symptoms of flank and abdominal pain, symptoms Tyler lacked. Even though Tyler's

symptoms pointed to gastroenteritis, Dr. Wilson still checked for the most common biopsy complications, infection and bleeding. The urinalysis she ordered showed that Tyler had no white blood cells (and thus no infection) and trace red blood cells in his urine which were consistent with his diagnosis of hematuria. Tyler also did not have any of the symptoms of acute hemorrhage, pallor, dizziness or rapid heart rate, and thus had no acute hemorrhage. But Dr. Wilson did not adequately test for less common complications such as hydronephrosis.

6. Tyler's persistent vomiting should have led Dr. Wilson to a higher suspicion and further testing for complications from a renal biopsy performed less than two weeks earlier, even though Tyler did not exhibit the most common symptom of a biopsy complication, flank pain.

7. The Court agrees with Plaintiff's experts that, as an alternative, Dr. Wilson should have taken steps to make sure Tyler was evaluated immediately by a nephrologist. Dr. Wilson's belief that Mindy would be conducting a post-operative follow up appointment with Dr. Leiser in the immediate future was unreasonable given that Dr. Leiser indicated in his voice mail message to Mindy that he wanted to follow up annually.

8. The Court finds that, as a 10-year old boy who relied on Mindy to obtain health care for him, Tyler in no way negligently contributed to his injuries.

9. Mindy had a duty to exercise that degree of care that an ordinary reasonable person would exercise in like or similar circumstances. *Faulk v. Northwest Radiologists, P.C.*, 751 N.E.2d 233, 239 (Ind. Ct. App. 2001)[, *trans. denied*]. A patient's failure to follow a physician's instructions may constitute contributory negligence. *Harris v. Cacdac*, 512 N.E.2d 1138, 1139 (Ind. Ct. App. 1987)[, *reh'g denied*, *trans. denied*]. Plaintiff could be barred from recovery if her contributory negligence was a proximate cause of Tyler's injury. *Cavens v. Zaberdac*, 849 N.E.2d 526, 529 (Ind. 2006). The negligence of a parent can be a contributing cause of the child's injury, therefore relieving a defendant of

some or all liability. *Witte v. Mundy*, 820 N.E.2d 128, 133 (Ind. 2005).

10. Mindy's failure to seek medical care for Tyler until January 2009, even though his vomiting persisted, a new complaint of flank pain presented, and Dr. Wilson instructed her to seek follow up care, constituted a breach of her duty of care. Mindy could have made an appointment at any time during that almost four month period with Dr. Wilson, Dr. Porter, or Dr. Leiser. She could have sought treatment for Tyler at an urgent care or emergency department. When Tyler began experiencing symptoms of flank pain in December, 2008, Mindy should have immediately returned to the Riley Nephrology Clinic for a follow up appointment. Yet Mindy did none of these things.

11. Mindy may have been negligent to some degree for failing to get follow up medical care from October 9, 2008 to January 22, 2009, but Dr. Wilson did not assert a non-party defense, did not name Mindy as a non-party, and is precluded from arguing that Mindy's negligence contributed to Tyler's loss.

12. The failure of Dr. Wilson to exercise reasonable care for Tyler's health needs contributed to the loss of Tyler's kidney. Without any medical intervention, the urinoma continued to grow to the point that it caused obstruction, hydronephrosis, and, eventually, loss of Tyler's kidney.

Appellants' Appendix at 28, 31, 35-42. The court entered judgment in favor of Tyler and against the Appellants and awarded Tyler damages totaling $255,000.

## *Discussion*

The issue is whether the court's Judgment is clearly erroneous. When a trial court enters findings of fact and conclusions thereon, findings control only as to the issues they cover and a general judgment will control as to the issues upon which there are no findings. *Yanoff v. Muncy*, 688 N.E.2d 1259, 1262 (Ind.

1997). A general judgment entered with findings will be affirmed if it can be sustained on any legal theory supported by the evidence. *Id.* When a court has made special findings of fact, an appellate court reviews sufficiency of the evidence using a two-step process. *Id.* First, it must determine whether the evidence supports the trial court's findings of fact, and second it must determine whether those findings of fact support the trial court's conclusions. *Id.* Findings will be set aside only if they are clearly erroneous. *Id.* Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference. *Id.* In order to determine that a finding or conclusion is clearly erroneous, an appellate court's review of the evidence must leave it with the firm conviction that a mistake has been made. *Id.*

[11] The Appellants argue that the court's Judgment should be reversed because of Mindy's failure to seek follow up medical treatment for Tyler between the time he was seen by Dr. Wilson and January 22, 2009, when he was seen by Dr. Kosten. They contend that this constituted contributory negligence which must be imputed to Tyler, and that it was an intervening, superseding cause. We address each of the Appellants' arguments separately.

A. *Contributory Negligence*

[12] Under Indiana law, the historic common law defense of contributory negligence remains available to defendants in cases alleging medical malpractice. *Cavens v. Zaberdac*, 849 N.E.2d 526, 529 (Ind. 2006). The Indiana Comparative Fault Act replaced the defense of contributory negligence, which completely bars a

plaintiff from any recovery, with a system providing for the reduction of a plaintiff's recovery in proportion to the plaintiff's fault, but this Act does not apply to actions for medical malpractice. *Id.* (citing Ind. Code § 34-51-2-1). The contributory negligence defense has been applied in medical malpractice cases. *Id.* (citing *Mem'l Hosp. of South Bend, Inc. v. Scott*, 261 Ind. 27, 300 N.E.2d 50 (1973) (defense alleged negligence of plaintiff in use of hospital toilet facilities, resulting in severe burns from scalding water); *Fall v. White*, 449 N.E.2d 628, 632-634 (Ind. Ct. App. 1983) (defendant doctor alleged patient's failure to provide complete and accurate information and failure to follow defendant doctor's instructions), *trans. denied*). A patient may not recover in a malpractice action where the patient is contributorily negligent by failing to follow the defendant physician's instructions if such contributory negligence is simultaneous with and unites with the fault of the defendant to proximately cause the injury. *Id.* (citing *Harris v. Cacdac*, 512 N.E.2d 1138, 1139-1140 (Ind. Ct. App. 1987), *reh'g denied*, *trans. denied*). A plaintiff's contributory negligence operates as a complete bar to recovery. *McSwane v. Bloomington Hosp. and Healthcare Sys.*, 916 N.E.2d 906, 911 (Ind. 2009).

[13]   We note that Tyler was ten years old at the relevant time. Children between the ages of seven and fourteen are required to exercise due care for their own safety under the circumstances of a child of like age, knowledge, judgment, and experience and there is a rebuttable presumption they are incapable of negligence. *Cook v. Ford Motor Co.*, 913 N.E.2d 311, 329 (Ind. Ct. App. 2009) (citing *Creasy v. Rusk*, 730 N.E.2d 659, 662 (Ind. 2000)), *trans. denied*.

[14]    The Appellants acknowledge that the non-party defense is created by Indiana's Comparative Fault Act, which is not applicable to medical malpractice cases, and accordingly "defendants are unable to attribute fault to non-parties in malpractice cases. Instead, they argue the trial court should have analyzed [Mindy's] negligence through the doctrine of imputed contributory negligence." Appellant's Brief at 8.

[15]    Tyler contends that this court need not decide whether the trial court correctly determined that Mindy was not added as a non-party because, under common law contributory negligence, the negligence of a parent may not be imputed to a minor child "as contributory negligence in an action by the child against a third party . . . ." Appellee's Brief at 7 (citing *Jeffersonville v. McHenry*, 22 Ind. App. 10, 53 N.E. 183 (1899); *Evansville v. Senhenn*, 151 Ind. 42, 47 N.E. 634 (1897), *reh'g denied*; *Gillam v. J.C. Penney Co.*, 341 F.2d 457 (7th Cir. 1965)). Tyler also directs the court's attention to cases from other jurisdictions, the Restatement (Second) of Torts, and an American Law Reports Annotation for the proposition that in personal injury actions the negligence of a parent may not be imputed to the child on a claim by the child. He asserts that the Appellants do not cite "a single medical malpractice case allowing for such an imputation under Indiana law" and "simply invoke their own proposed rule . . . ." *Id.* at 12 (internal quotations omitted).

[16]    The crux of this matter is whether any alleged contributory negligence by Mindy may be imputed to Tyler to bar Tyler's claim for medical malpractice. In general, Indiana courts have not allowed a parent's negligence to be imputed

to a child in a personal injury action by the child. *See Senhenn*, 151 Ind. at 45, 47 N.E. at 635 ("The law, taking cognizance of [a child plaintiff's] want of discretion, and that its tender years renders it impossible for it to know any better, exempts it from the charge of negligence. Upon what principle, then, we are led to inquire, may its parent's, guardian's, or custodian's negligence be imputed to it so as to take away its property in its cause of action for defendant's negligence making it a cripple for life? We know of none . . . ."). The Indiana rule is supported by the Restatement (Second) of Torts, which states unequivocally: "A child who suffers physical harm is not barred from recovery by the negligence of his parent, either in the parent's custody of the child or otherwise." RESTATEMENT (SECOND) OF TORTS, § 488 (1965). The Appellants request that this court create an exception to this rule under these circumstances.

[17]    The Appellants cite to *Witte* for the proposition that Mindy's alleged contributory negligence should be imputed to Tyler. In *Witte*, five-year-old Mikayla Mundy was riding her bicycle when she ran a stop sign and was struck by a car driven by Monica Witte, also a minor. 820 N.E.2d at 131. Mikayla's mother, Kristin, sued as Mikayla's next friend and also in her own capacity, naming Witte and her parents as defendants, and the defendants responded by asserting that Witte was not negligent and also that the accident was due to negligence on the part of both Mikayla and Kristin. *Id.* Before trial, Kristin moved to dismiss her individual claim without prejudice, and Mikayla moved for an order to preclude the defendants from offering evidence of negligence on

the part of Kristin by negligent supervision. *Id.* The defendants objected to Kristin's dismissal and, in the alternative, sought to amend their answer to include Kristin as a nonparty defendant under the comparative fault statute. *Id.* The trial court granted Kristin's motion to dismiss and denied the defendants' motion to add Kristin as a nonparty. *Id.*

[18] On transfer, the Indiana Supreme Court examined the question of whether Kristin was a proper nonparty defendant and determined that she was, noting that "[i]t is one thing to say a child under age seven is 'incapable of judgment or discretion' and therefore, as a matter of law, cannot be negligent" and that "[i]t is another thing to conclude that an adult's negligent supervision cannot be a contributing cause to the child's injury relieving a third party of some or all liability." *Id.* at 133. In so holding, the Court observed that, "[i]n a comparative fault cause, 'the jury shall determine the percentage of fault of the claimant, of the defendant, and of any person who is a nonparty. . . .'" *Id.* (quoting Ind. Code § 34-51-2-7). It noted that nonparty is defined as "a person who caused or contributed to cause the alleged injury, death, or damage to property but who has not been joined in the action as a defendant," *id.* (quoting Ind. Code § 34-6-2-88), and that accordingly "the comparative fault statute 'no longer requires that the nonparty be liable to the plaintiff, but only that he or she have caused or contributed to the cause of the plaintiff's injury.'" *Id.* (quoting *Bulldog Battery Corp. v. Pica Invs.*, 736 N.E.2d 333, 338 (Ind. Ct. App. 2000), *reh'g denied*). Importantly, the Court also observed that "[t]he trial court's instruction that the parent's negligence is not attributable to the child

would have been proper" had Kristin not been a valid nonparty defendant but that, under the comparative fault scheme, it was error to deny the defendants' motion to name her as a nonparty. *Id.* (citing *Senhenn*, 151 Ind. at 48, 47 N.E. at 435).

[19]    We decline the Appellants' invitation to create an exception to the general rule that a parent's alleged contributory negligence may not be imputed to a child's medical malpractice claim. The Appellants essentially ask this court to apply a principle from *Witte*, arising out of comparative fault, to the law of common law contributory negligence applicable in medical malpractice actions. Such a rule in this context would have severe consequences because contributory negligence acts as a complete bar to recovery. Indeed, the purpose of the Comparative Fault Act is to ameliorate the harshness of the common law doctrine of contributory negligence. *Baker v. Osco Drug, Inc.*, 632 N.E.2d 794, 797 (Ind. Ct. App. 1994), *trans. denied*. Even in *Witte* the Court recognized, that under the common law, negligence on the part of a parent may not be imputed to the child – we see no reason to deviate from this long-standing rule. *See Young v. Washington Hosp.*, 761 A.2d 559, 563-564 (Pa. Super. Ct. 2000) (noting that the plaintiffs in a medical malpractice action "argue that the allegations of contributory negligence are unsupported by the record and that their conduct, subsequent to [defendants'] negligence, was not a proximate or superseding cause of the child's injury. [The Plaintiffs] emphasize that the parents and the child are separate and distinct persons in the eyes of the law. We agree that this latter point is dispositive. As this action was brought by the parents on behalf

of the child, the actions of the parents—their asserted contributory negligence or failure to mitigate damages—is irrelevant."), *appeal denied*; *Vieregger v. Robertson*, 609 N.W.2d 409, 416 (Neb. Ct. App. 2000) (holding that the trial court erred in not instructing the jury that "the negligence or acts or omissions of the parents cannot be imputed to the child" on a medical malpractice action), *review overruled*; *Galvin v. Cosico*, 456 N.Y.S.2d 259, 259 (N.Y. App. Div. 1982) ("The court correctly charged that Justine, who was 3 years and 10 months of age at the time of the claimed malpractice, was incapable as a matter of law of contributory negligence; and that even if Justine's mother was negligent in not immediately transporting her to the hospital, as defendants contend, such negligence could not be ascribed to Justine."), *appeal dismissed*.[4]

B. *Intervening, Superseding Cause*

[20] In general, a defendant's act is a proximate cause of an injury if the injury "is the natural and probable consequence of the act and should have been reasonably foreseen and anticipated in light of the circumstances." *Scott v. Retz*, 916 N.E.2d 252, 257 (Ind. Ct. App. 2009). However, under the doctrine of superseding causation, "a chain of causation may be broken if an independent agency intervenes between the defendant's negligence and the resulting injury." *Id.* "The key to determining whether an intervening agency has broken the original chain of causation is to determine whether, under the circumstances, it

---

[4] We observe that, although the Appellants raised the defense of mitigation of damages in their answer, they do not assert that defense on appeal.

was reasonably foreseeable that the agency would intervene in such a way as to cause the resulting injury." *Id.*; *see also Conder v. Hull Lift Truck, Inc.*, 435 N.E.2d 10, 14 (Ind. 1982) (the action of someone or something other than the alleged tortfeasor that affects the chain of causation is an intervening cause; it becomes a superseding cause breaking the chain of causation if it was not foreseeable). When assessing foreseeability in the context of proximate cause, courts "evaulat[e] the particular circumstances of an incident after the incident occurs." *Scott*, 916 N.E.2d at 257-258. Although proximate cause is generally a question of fact to be determined by the jury, it becomes a question of law when the relevant facts are undisputed and lead to only a single inference or conclusion. *Id.* at 258 (citing *Peters v. Forster*, 804 N.E.2d 736, 743 (Ind. 2004)).

[21] This court in *Scott* identified factors previous cases have examined "[i]n determining whether an intervening agency is unforeseeable and therefore superseding" as follows:

> First, we have looked to whether the intervening actor is independent from the original actor, or, in other words, whether the intervening actor is an "independent agency." *Hassan*[ *v. Begley*], 836 N.E.2d [307, 308 (Ind. Ct. App. 2005), *reh'g denied*] . . . .
>
> Second, we have looked to whether the instrumentality of harm is under the complete control of the intervening actor. . . .
>
> Third, this court has looked to whether the intervening actor, as opposed to the original actor, is in the better position to prevent the harm. . . .

*Id.*

[22] The Appellants assert that the Indiana Supreme Court in *Walker v. Rinck*, 604 N.E.2d 591 (Ind. 1992), "did not reject the possibility that 'unforeseeable' actions by parents could be an intervening cause." Appellants' Brief at 14. They cite to cases from other jurisdictions for the proposition that "a patient's failure to seek follow up care is not foreseeable and is an intervening cause of that patient's injuries" and assert that this "rationale also applies to parents supervising their children who are patients."[5] *Id.* at 15. The Appellants argue that Mindy's failure to seek follow up medical care for Tyler despite his persistent vomiting and development of flank pain was an intervening cause. They assert that Mindy was an independent force not under the control of the Appellants, was in complete control over whether Tyler received follow up medical care, and was in a better position to prevent harm to Tyler.

[23] Tyler argues that the Appellants "have failed to establish that any delay by Mindy in follow up visits was the proximate cause of the loss of Tyler's kidney," noting that a treatise on torts states that "[t]he intervening force, to become a superseding cause and break the chain of causation, must be a cause in fact of the harm of which the plaintiff complains, that is, it must be a cause sine qua non." Appellee's Brief at 15-16 (quoting FOWLER HARPER, A

---

[5] The Appellants cite to *Williams v. Birkeness*, 34 F.3d 695 (8th Cir. 1994), *reh'g denied*; *Eldred v. Blue Cross & Blue Shield of Ga., Inc.*, 274 Ga. App. 798 (2005); and *Sorina v. Armstrong*, 554 N.E.2d 943 (Ohio Ct. App. 1988).

TREATISE ON THE LAW OF TORTS § 114 (1933)). Tyler also notes that "Dr. Kosten was himself unsure of what was causing Tyler's flank pain and vomiting, even though he was aware that Tyler had been vomiting since his renal biopsy," that the Appellants "never presented any expert medical testimony at trial to show that any delay by Mindy in Tyler's follow up care prevented the urinoma from being successfully treated," and that "[w]ithout such evidence, there is no proof that any negligence on Mindy's part was the proximate cause of the loss of Tyler's kidney." *Id.* at 19-20.

[24] We need not examine the foreseeability of Mindy's actions because, as asserted by Tyler, we find that the evidence presented at trial did not reveal that the delay in seeking follow up medical attention was an intervening cause of Tyler's injury, i.e., the loss of his kidney. The evidence presented showed that Tyler developed flank pain in December 2008. Dr. Wilson at trial testified that the obstruction likely developed around this time. Mindy brought Tyler to see Dr. Kosten on January 22, 2009, at which appointment Dr. Kosten did not identify the urinoma and obstruction, and he referred Tyler to pediatric gastroenterology. Tyler was examined over two months later, on March 30, 2009, and tests revealed the urinoma, which had gradually increased in size until it obstructed the kidney, causing an obstructive nephropathy.

[25] Thus, the evidence reveals that Mindy brought Tyler for medical treatment in January 2009 but that the obstruction was not detected for over two months following that appointment. There was no evidence presented that, even had the urinoma been discovered in January when Mindy brought Tyler to see Dr.

Kosten, Tyler still would have lost the kidney. In other words, evidence was not presented showing that the delay until January 22, 2009 was a cause sine qua non of the injury. Accordingly, we conclude that Mindy's failure to immediately bring Tyler to see a doctor after he developed flank pain, instead waiting for a few weeks to do so, did not constitute an intervening cause of Tyler's injury.

## *Conclusion*

[26] For the foregoing reasons, we affirm the trial court's Judgment.

[27] Affirmed.

Baker, J., and Robb, J., concur.