

FILED

Sep 13 2018, 8:36 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANTS

Kevin W. Betz
Sandra L. Blevins
Betz + Blevins
Indianapolis, Indiana

ATTORNEYS FOR APPELLEES

Michael E. O'Neill
Marian C. Drenth
O'Neill McFadden & Willett, LLP
Schererville, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Whitney A. Gates, Jonathan W. Gates, and Jacob A. Gates,

*Appellants-Plaintiffs,*

v.

Joseph D. O'Connor and Bunger & Robertson, LLP,

*Appellees-Defendants.*

September 13, 2018

Court of Appeals Case No. 18A-CT-58

Appeal from the Monroe Circuit Court

The Honorable Heather A. Welch, Special Judge

Trial Court Cause No. 53C01-1405-CT-877

**Crone, Judge.**

# Case Summary

Whitney A. Gates, Jonathan W. Gates, and Jacob A. Gates (hereinafter "Whitney")[1] appeal the trial court's entry of summary judgment in favor of attorney Joseph D. O'Connor and Bunger & Robertson, LLP ("the law firm")[2] on Whitney's claim for legal malpractice. Whitney's complaint against O'Connor alleged that O'Connor negligently failed to pursue and obtain a dissolution of marriage between his father, Jerry Gates, and Jerry's wife, Susan, prior to Jerry's death, which allegedly resulted in a substantial loss of inheritance to Whitney. We note that while this case is nominally about lawyer malpractice, namely, whether O'Connor's purported breach of his duty of care proximately caused Whitney's loss of inheritance, it is really about the "trial within a trial," that is, the law that applied to the underlying dissolution of marriage proceedings. After a thorough review of such law as well as the designated evidence, we conclude that, as counsel for Jerry while Whitney was acting as Jerry's guardian, there was nothing O'Connor could have done to compel a dissolution of Jerry's marriage. Thus, as did the trial court, we conclude that O'Connor has negated the element of proximate cause in the

---

[1] Although Jerry's grandsons Jonathan and Jacob are also named as appellants, Jerry's son Whitney, acting as Jerry's guardian, was the relevant actor during the underlying dissolution case, as well as during the instant legal malpractice action. Therefore, we refer to Whitney alone throughout this opinion.

[2] Although the law firm is a party on appeal and filed a joint appellees' brief with O'Connor, O'Connor was the relevant actor during the underlying dissolution and was the primary defendant in the legal malpractice action. Therefore, we refer mainly to O'Connor throughout this opinion.

legal malpractice action and is entitled to summary judgment. Accordingly, we affirm.[3]

## Facts and Procedural History

[2] Jerry was a successful Bloomington real estate developer and businessman with an interest in various closely held corporations and limited liability companies. Most of his assets were acquired after he married Susan in March 1986. Before the marriage, Jerry and Susan executed a prenuptial agreement. Among other things, the agreement provided that, in the event of a dissolution of the marriage, Susan would receive her separate property, one-half of all jointly held property, and a cash payment based upon the duration of the marriage prior to the commencement of a dissolution. The agreement also contained provisions limiting Susan's inheritance from Jerry's estate based on the duration of the marriage provided that they were married at the time of his death. Jerry executed a will with corresponding provisions.

---

[3] We note that Whitney has filed a separate motion for recusal of one of our colleagues from participating on the panel for this appeal. Since that judge was never a member of this panel, we deny his motion as moot by separate order issued contemporaneously with this opinion. Cases are randomly assigned to judicial panels on the Court of Appeals and the Indiana Code of Judicial Conduct specifically provides that "[a] judge shall disqualify himself ... in any proceeding in which the judge's impartiality might reasonably be questioned ...." Ind. Judicial Conduct Rule 2.11(A). This obligation is enforced by the individual judge against him or herself. *Mathews v. State*, 64 N.E.3d 1250, 1255 (Ind. Ct. App. 2016), trans. denied (2017); *see Indiana Gas Co. v. Indiana Fin. Auth.*, 992 N.E.2d 678, 679 (Ind. 2013) (noting that the test for recusal is "whether an objective person, knowledgeable of all the circumstances, would have a reasonable basis for doubting the judge's impartiality"). In addition to denying the motion as moot, we disapprove of the condescending tone of the motion as well as the suggestion that our colleague would not have understood the obligation to recuse if he or she believed there existed a reasonable basis for doubting his or her impartiality. Although Whitney's attorneys specifically blame him for the motion to recuse, we remind counsel that "[w]e expect those who have been granted the special privilege of admission to the bar to bring reasonable objectivity to their statements about judicial officers" and "to rise above the raw emotions and accusations that impede rather than enhance the judicial process." *In re Dixon*, 994 N.E.2d 1129, 1136 (Ind. 2013) (citing Ind. Professional Conduct Rule 8.2(a)).

[3]     In March 2007 Jerry suffered an ischemic stroke, which deprived his brain of an adequate blood supply. This was the first of three strokes that eventually led to Jerry's death six years later in March 2013. Jerry had a good physical recovery from his first stroke, but the stroke resulted in cognitive and personality changes and negatively affected his attitude, demeanor, short-term memory, and judgment.

[4]     Notwithstanding the first stroke, Jerry remained competent and retained his testamentary capacity, and, in October 2007, he executed another will and established a revocable trust. This second will and the trust provided Susan with a larger inheritance than under Jerry's 1986 will and the prenuptial agreement as long as Jerry and Susan were still married at the time of Jerry's death. Jerry also named Susan as his attorney-in-fact under a general durable power of attorney over all his personal, intangible, and real property. The power of attorney was a stand-by instrument; it would take effect only if Jerry were declared incapacitated by two licensed physicians unrelated to Jerry or his family. The instrument named Jerry's son, Whitney, and others as successor attorneys-in-fact in the event Susan was unable or unwilling to serve.

[5]     In August 2008, after Jerry was diagnosed with hypomania, one of his physicians signed an affidavit stating that Jerry was incapacitated and unable to effectively manage his property or financial affairs. On August 15, 2008, Whitney filed his petition for the appointment of a guardian over Jerry's person and estate under cause number 53C07-0808-GU-98 (the "guardianship"). On that same date, Susan filed a verified petition for dissolution of marriage under

cause number 53C07-0808-DR-491 (the "dissolution") after more than twenty-two years of marriage.

[6] Jerry resisted the appointment of a guardian, and in January 2009 the parties entered into a private settlement agreement, which was approved by the guardianship court. The guardianship was then dismissed without prejudice. However, six months later, in June 2009, Whitney filed a motion to set aside the dismissal and to reinstate the cause of action, to which Jerry objected. In July 2009, the guardianship court set aside its prior dismissal and reinstated Whitney's guardianship petition.

[7] Also in June 2009, Jerry's then-attorney Andrew Z. Soshnick informed Whitney that Jerry was revoking Whitney's authority as a successor attorney-in-fact under the "alleged General Durable Power of Attorney," Appellees' App. Vol. 4 at 92, and, two days later, pursuant to Indiana Code Section 30-5-3-5,[4] Whitney filed an action entitled "Verified Petition for Judicial Interpretation of a Power of Attorney Document and for Instructions to Attorney-in-Fact" under cause number 53C07-0906-MI-1464. Among other things, Whitney requested that the court find that Jerry lacked capacity to control or revoke the power of attorney, find that Whitney is a successor attorney-in-fact, and instruct Whitney as to the powers he may exercise under the power of attorney.[5] All

---

[4] That statute provides in relevant part as follows: "Upon petition by an interested person, the court may construe a power of attorney and instruct the attorney in fact if the court finds that the principal lacks the capacity to control or revoke the power of attorney." Ind. Code § 30-5-3-5.

[5] Susan had renounced her appointment as Jerry's attorney-in-fact.

three actions—the guardianship, the dissolution, and the petition for judicial interpretation of the power of attorney—were then pending simultaneously before Special Judge Nardi in the Monroe Circuit Court.

[8] After multiple and lengthy guardianship hearings, almost three years after Whitney had first filed his petition for appointment of guardian, in June 2011 the guardianship court entered its twenty-seven-page order with detailed findings of facts, conclusions, and judgment, which adjudicated Jerry to be incapacitated and determined that a guardian for his person and estate should be appointed. The court concluded that Whitney was a "good candidate" to be appointed guardian of Jerry's person and estate, recognized that in his power of attorney Jerry had requested that Whitney be appointed as his guardian, and stated that "the Court is obligated to honor that request if at all possible." Appellants' App. Vol. 3 at 84.

[9] At the same time, the court appointed attorney Robert Ralston to serve as co-guardian with Whitney over Jerry's estate "until the dissolution matter is completed." *Id.* The court had previously appointed Ralston as receiver of Jerry's personal financial affairs. Finding that Whitney "obviously has a close relationship with his stepmother," Susan, the order further provided that "Attorney Ralston … shall have the discretion to make all decisions regarding the dissolution matter and shall act in [Jerry's] best fiduciary interest." *Id.* at 85.

[10]   Some ten months later, in March 2012, the co-guardians filed their "Petition to Retain Legal Counsel for Pending Dissolution Matter," and the guardianship court issued its order authorizing the co-guardians to retain O'Connor to represent Jerry in the dissolution of marriage proceeding.[6]  The order further stated that "[c]o-guardian Robert Ralston shall have the authority to give direction to attorney Joseph O'Connor and to make decisions concerning the dissolution matter, including strategies for resolution or trial."  *Id.* at 164.

[11]   On March 29, 2012, Whitney and Ralston retained O'Connor to represent Jerry in the dissolution.  Shortly thereafter, on May 7, one of O'Connor's associates at the law firm prepared a memorandum for him that evaluated "the division of Jerry Gates' estate in the event he died *before* or *after* a [dissolution] could be finalized.  The [m]emorandum concluded that Susan Gates would likely receive a larger inheritance as Jerry's spouse than she would receive as his former spouse."  *Id.* at 169.  O'Connor forwarded the memorandum to Whitney.

[12]   Thereafter, O'Connor met with Whitney and Ralston "to discuss the [dissolution] and potential property settlement."  *Id.* at 168.  Pursuant to those meetings, O'Connor conveyed a proposed settlement to Susan's counsel, Ryan Cassman, on May 29.  That proposed settlement offer was "limited by the 1986 Prenuptial Agreement," in accordance with "the Guardians' requests."  *Id.* at

---

[6]  O'Connor was the fourth attorney to represent Jerry in the dissolution action.  In addition to attorney Soshnick, attorneys Jamie L. Zibrowski and Paul D. Baugh also had each appeared on Jerry's behalf in the dissolution action prior to O'Connor, although Jerry was without representation for more than three months immediately preceding O'Connor's retention.

170. O'Connor followed up with Cassman on June 20 and requested a response. O'Connor further requested that the two sides schedule mediation.

[13] O'Connor and Cassman spoke by phone in early July. Cassman informed O'Connor that Susan "was desirous of completing the dissolution process" and agreed "to proceed with mediation." *Id* at 168. O'Connor and Cassman continued to be in contact throughout July. On August 15, O'Connor asked Cassman for a response to the proposed settlement offer and to proposed mediation details, among other things. Susan did not respond to the proposals.

[14] Instead, on September 20, 2012, Susan moved to dismiss her petition for dissolution of marriage after it had been pending for more than four years. On September 24, the dissolution court issued its order dismissing Susan's petition for dissolution. On that same date, at Whitney's direction, O'Connor filed a counter petition for dissolution of marriage for Whitney, as Jerry's guardian. Cassman immediately emailed O'Connor stating that he did not believe that Whitney had authority to seek a dissolution on Jerry's behalf, that Susan wished to remain married to Jerry, and that Susan believed Whitney was using his position as guardian to push to dissolve the marriage in order to increase his own inheritance. Two days later, O'Connor advised Whitney that there was no specific legal authority allowing a guardian to pursue dissolution of marriage on behalf of his ward. Nonetheless, Whitney desired to proceed. Accordingly, on October 1, O'Connor filed a motion to set aside the court's order granting Susan's motion to dismiss on the grounds that the dissolution statute provided a five-day grace period for the opposing party, in this case, Jerry, by his duly

appointed guardian Whitney, to file a counter petition for dissolution before an action could be dismissed. *See* Ind. Code § 31-15-2-12. Susan responded with an Indiana Trial Rule 12(B)(6) motion to dismiss Whitney's counter petition. However, the trial court granted Whitney's motion to set aside and issued an order setting aside its prior order granting Susan's motion to dismiss her petition. Then, after a hearing on November 28, the court issued its order denying Susan's motion to dismiss Whitney's counter petition.

[15] Susan did not seek an interlocutory appeal of the dissolution court's orders at this point. O'Connor and Cassman re-engaged in settlement discussions, and, in January 2013, the parties agreed to attend mediation in April. Although the parties had agreed to mediation, Cassman made clear to O'Connor "his intention to file a summary judgment motion and/or appeal if necessary" on the trial court's rulings and the legitimacy of Whitney's counter petition for dissolution of marriage. Appellants' App. Vol. 2 at 189, 233-34. The parties then designated a mediator and scheduled mediation for April 12.

[16] On March 12, one month before the scheduled mediation, Jerry suffered his second stroke. The next day, O'Connor moved for an emergency bifurcation of the dissolution proceedings requesting the court to immediately issue a decree of dissolution with distribution of the marital estate to occur on a later date. The dissolution court held an emergency hearing on the motion the following day, at which Cassman objected to O'Connor's bifurcation proposal. Rather than rule on the emergency petition, the trial court set another hearing on the request to bifurcate for April 9. However, on March 18, 2013, Jerry died at age

seventy-eight. Consequently, O'Connor moved to dismiss the dissolution as moot, which the court granted.

[17] On May 3, 2014, Whitney filed his complaint for damages against O'Connor and the law firm, asserting claims of legal malpractice, gross negligence, breach of contract, and breach of fiduciary duty. In particular, Whitney alleged that O'Connor had committed legal malpractice when O'Connor did not secure a decree of marriage dissolution prior to Jerry's death, which resulted in Whitney and his heirs receiving a lesser share of Jerry's estate than they would have received had the marriage been dissolved.

[18] O'Connor moved for summary judgment and designated the affidavit of Evansville family law attorney Kelly Lonnberg, who stated that "O'Connor … diligently pursued a resolution and final divorce settlement" of the marital estate, which involved "the division of multiple complex assets, including properties"; that "O'Connor … complied with the standard of care applicable to attorneys engaged in the practice of Family Law during [his] representation of Jerry Gates at all times"; and that nothing that O'Connor "did or allegedly failed to do in the course of [his] representation of Jerry Gates, through the Guardianship, caused monetary damage to [Whitney], or caused [Whitney's] inheritance in Jerry Gates' estate to be drastically reduced as claimed …." Appellants' App. Vol. 3 at 20-21. Lonnberg further stated that, "[h]ad [Cassman] filed a motion for summary judgment on the [validity of the] counter petition for dissolution filed by Whitney Gates, as Guardian of Jerry Gates, . . . Susan Gates would have succeeded" because "[i]n 2012 and 2013,

Indiana law did not provide a Guardian legal authority to file a dissolution action on behalf of [his] Ward." *Id.* at 23. In light of that assessment, Lonnberg stated that "[t]he dissolution … could not have been finalized after Susan Gates dismissed her claim for dissolution due to the Guardianship that had already been established before [O'Connor's] involvement as counsel." *Id.* at 24.

[19] In response to O'Connor's motion for summary judgment, Whitney designated the deposition and supplemental affidavit of Indianapolis family law attorney M. Kent Newton. In his deposition, Newton testified that, in 2012 and 2013, there was "ambiguity" in Indiana's case law on the authority, or lack thereof, of a guardian to file a counter petition for dissolution on behalf of his ward. Appellants' App. Vol. 7 at 9. He further testified that he was "unaware of any prohibition" against such a filing under Indiana's guardianship statutes in effect at the time of O'Connor's representation. *Id.* at 10. And he stated that "family law practitioners" had a "mixed" assessment of the law such that it was an "open question" among them whether such a procedure might be valid. *Id.* at 16. However, when pressed to identify or produce case law authority in support of his position, Newton was unable to do so.

[20] In any event, Newton further averred that a reasonably competent family law attorney in Indiana in a dissolution action that involved such a large estate and a guardianship over the attorney's client would have acted "expeditiously" upon retention to put "motivation … [on the] opposing party to come to settlement either through mediation or negotiations …." *Id.* at 35. In this

respect, Newton identified a number of procedures—any one of which might or might not have ultimately been successful—that he thought O'Connor should have immediately implemented, which included filing a counter petition for dissolution, filing an emergency motion to bifurcate the proceedings, filing an emergency motion to be excused from the local mediation requirement, and immediately requesting that a trial date be set.

[21]     As Newton explained:

> In a family law matter an element and a major element in many cases is motivating the other side to take action that should be taken expeditiously, i.e. get ready for trial or settle ….
>
> ….
>
> …. [O'Connor] failed to go along two tracks of preparing for litigation … [and] at the same time keeping the door open for settlement.
>
> ….
>
> …. By filing [the counter petition, for example,] you provide motivation for wife and wife's counsel to think realistically and act realistically toward[] settlement or toward getting ready for trial.  The name of the game … is motivation.
>
> By filing the [counter petition], whether or not it ultimately is determined to be valid, … and by asking for a trial setting, by asking for mediation with an order with teeth in it as to timing, you provide that motivation.  That was not done in the many months [in which it] should have been done.

....

> .... [T]he issue of motivation is quite important and quite
> valuable. To motivate the other side to come to a reasonable
> settlement position or to mediate or to determine the effect or
> non-effect of things like prenuptial agreements is a very
> important strategy. I did not see any motivation of any
> significance in [O'Connor's] conduct.

*Id.* at 35-36, 90. In other words, Newton asserted that O'Connor had breached his duty of care to Jerry by not promptly acting in a manner calculated to bring "leverage" to bear on Susan to encourage her to settle the dissolution action. *See* Appellants' App. Vol. 8 at 29.

[22] Yet, when asked whether he knew if any of his preferred strategies might have been effective in motivating Susan to settle, Newton admitted that persuading Susan to accept a settlement

> could be a matter of [her] tactics, could be a matter of the
> prenuptial issue had [it] been resolved by the judge, could be a
> matter of instruction by [Susan to Cassman], could be a matter of
> one party or another's interest to get on with his or her life.
> There might be estate planning issues, there may be family
> pressures[. Y]ou can imagine things like that and more that
> would cause a competent family law attorney to agree [to settle].

*Id.* at 76. Newton further acknowledged that getting Susan to accept a settlement

depends on how much, when paid, the terms of a settlement and other non-financial considerations. Clients settle cases all the time because they are tired of the litigation or because of non-financial factors or because of other things occurring in their life or in the world.

So your question [regarding whether any of the proposed procedures would have actually been effective on Susan] is to some extent impossible to answer because we don't know the totality of the considerations that she and Ryan Cassman were working with.

….

…. [I]t is a dynamic situation. I fault [O'Connor] for not trying, for not doing what a reasonably cautious, reasonably experienced family law attorney in Indiana would do.

*Id.* at 80, 82. Thus, notwithstanding Newton's detailed critique and criticism of O'Connor's representation, he did not state that but for O'Connor's allegedly inadequate representation the outcome would have been different.

[23] In its thorough order on summary judgment, the trial court concluded that there was a genuine issue of material fact with respect to whether O'Connor had breached his duty of care during his representation of Jerry. However, the trial court concluded, as a matter of law, that O'Connor had successfully negated the element of proximate cause. Specifically, the trial court concluded that the dissolution court erred in denying Susan's motion to dismiss her own petition for dissolution and further erred in declining to dismiss Whitney's counter petition. The trial court determined that a proper grant of Susan's motion to

dismiss her petition and her motion to dismiss Whitney's counter petition would have precluded any damages attributable to O'Connor's alleged malpractice. That is, the trial court concluded that given that Susan would have been entitled to summary judgment in the dissolution action on her motions to dismiss both her petition and Whitney's counter petition, Whitney had failed to demonstrate how he would have been better off had O'Connor not breached his duty of care to Jerry. Accordingly, the trial court concluded that O'Connor was entitled to summary judgment on Whitney's legal malpractice action and related collateral claims. This appeal ensued.[7]

# Discussion and Decision

# Standard of Review

[24] Whitney appeals the trial court's entry of summary judgment. We review summary judgments de novo, applying the same standard as the trial court. *Erie Indem. Co. v. Estate of Harris*, 99 N.E.3d 625, 629 (Ind. 2018). Summary judgment is appropriate only when the designated evidence shows there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Id*. (citations omitted). When the trial court has granted

---

[7] The appellants' briefs contain numerous violations of the Indiana Rules of Appellate Procedure. In sum, under the pretext of advocacy, the appellants' attorneys have littered their briefs with argument where it does not belong, irrelevant facts and unsupported legal conclusions, and what also appears to be a conscious attempt to confuse and conflate the issues. This is inexcusable behavior for these experienced appellate attorneys and only operates to the detriment of their clients. In fact, the same counsel were recently sternly cautioned by published order of our supreme court that such behavior is "not effective advocacy and [does] not advance the orderly disposition of appeal." *Care Grp. Heart Hosp., LLC v. Sawyer*, 93 N.E.3d 743, 743 (Ind. 2018). This warning clearly went unheeded. We apprise counsel that continued disregard of these explicit warnings may expose counsel to more severe consequences.

summary judgment, the nonmoving party has the burden on appeal of persuading us that the grant of summary judgment was in error. *Adams v. ArvinMeritor, Inc.*, 48 N.E.3d 1, 9 (Ind. Ct. App. 2015).

[25]     Whitney's complaint against O'Connor alleged four claims, but we agree with the trial court that the resolution of Whitney's legal malpractice claim also resolves Whitney's other claims. To prevail on a legal malpractice claim, a plaintiff must establish: (1) employment of the attorney and/or firm (duty); (2) failure of the attorney and/or firm to exercise ordinary skill and knowledge (breach); (3) proximate cause (causation); and (4) loss to the plaintiff (damages). *Flatow v. Ingalls*, 932 N.E.2d 726, 729 (Ind. Ct. App. 2010) *trans. denied* (2011). It is appropriate for a trial court to grant summary judgment on a legal malpractice claim if the designated evidence negates at least one of these elements. *Id.* Only the third element – proximate cause – is at issue here.[8]

[26]     Our supreme court recently reiterated that the "trial within a trial" doctrine governs claims for legal malpractice. *Roumbos v. Vazanellis*, 95 N.E.3d 63, 65-66 (Ind. 2018). To prove causation in this context, the client must show that "the outcome of the botched representation would have been more favorable to the client had the lawyer not been negligent." *Id.* In other words, Whitney must prove that O'Connor's negligence proximately caused his alleged loss of

---

[8] At least for summary judgment purposes, O'Connor does not dispute that he owed Whitney a duty of care, even though Jerry, not Whitney, was his client. We emphasize that we do not reach or consider whether and do not hold that an attorney in a dissolution action owes a duty to nonclient heirs of the marital estate. O'Connor also does not dispute the trial court's conclusion that the designated evidence creates a genuine issue of material fact regarding whether he breached his duty, and we need not express an opinion otherwise.

inheritance. *Id.* Thus, it is Whitney's burden to prove that, but for O'Connor's alleged errors in representation, the outcome of the dissolution proceedings would have been different (meaning that the marriage would have been dissolved before Jerry's death, presumably allowing Whitney to inherit more of Jerry's estate). We conclude, as a matter of law, that Whitney cannot satisfy this burden.

## Section 1 – The designated evidence negates the proximate cause element of the legal malpractice claim.

[27] In legal malpractice actions, the proximate cause requirement is a "but for" requirement. *See, e.g.*, Richard H.W. Maloy, *Proximate Cause: The Final Defense in Legal Malpractice Cases*, 36 U. MEM. L. REV. 655, 671-77 (2006). That is, the client-plaintiff must show that, had the attorney-defendant not acted as he did, the result of the underlying lawsuit would have been different. *Id.* Where, as here, the underlying proceeding was not previously determined on the merits, we "must in effect conduct a trial or an appeal to determine if the client would have succeeded but for the negligence of the attorney." *Id.* at 675-76 (footnotes omitted). "Although proximate cause is generally a question of fact to be determined by the jury, it becomes a question of law when the relevant facts are undisputed and lead to only a single inference or conclusion." *Wilson v. Lawless*, 64 N.E.3d 838, 848-49 (Ind. Ct. App. 2016), *trans. denied* (2017).

[28] In support of his motion for summary judgment, O'Connor designated Lonnberg's affidavit. According to Lonnberg, nothing O'Connor did or failed to do in his representation of Jerry in the dissolution action caused Whitney's

claimed damages in the legal malpractice action. Lonnberg further stated that, because O'Connor's representation of Jerry began after the guardianship had been established, and because Indiana law in 2012 and 2013 did not permit a guardian to file a petition for dissolution on behalf of his ward, nothing O'Connor could have done would have created a different result once Susan filed her motion to dismiss. In response to O'Connor's motion and Lonnberg's affidavit, Whitney designated the deposition and supplemental affidavit of his expert, Newton, who disputed Lonnberg's assessments.[9]

[29] Thus, to determine whether the outcome of the dissolution action would have been different but for O'Connor's alleged errors in representation, we must resolve the following "trial within a trial" issues: (1) whether Susan was, as a matter of law, entitled to the dismissal of her dissolution petition; (2) whether Indiana law in 2012 and 2013 permitted Whitney, as Jerry's guardian, to file a counter petition for dissolution on behalf of Jerry; and (3) whether O'Connor could have compelled Susan to settle the dissolution proceedings prior to her motion to dismiss. We turn to the law applicable at the time to dissolution of marriage.

---

[9] Whitney briefly argues that the trial court erred in granting O'Connor's motion to strike a portion of Newton's expert opinion testimony. A trial court has broad discretion in granting or denying a motion to strike. *Devereux v. Love*, 30 N.E.3d 754, 766 (Ind. Ct. App. 2015). The trial court's decision will not be reversed unless prejudicial error is clearly shown. *Id*. Our review of the stricken testimony reveals that such testimony either involved improper legal conclusions, *see id.*, or is irrelevant to the dispositive proximate cause issue. Thus, Whitney cannot show prejudice, and we decline to address this issue further.

## Section 1.1 – Susan was, as a matter of law, entitled to the dismissal of her dissolution petition.

[30] After originally issuing its order granting Susan's motion to dismiss her dissolution petition, the dissolution court set aside that ruling, in effect denying her decision to no longer pursue a dissolution of the marriage. The trial court concluded that the dissolution court erred and that Susan was, as a matter of law, entitled to the dismissal of her petition. We agree with the trial court.

[31] Here, Indiana statutory law provides that a petitioner in a dissolution of marriage action is entitled to withdraw her petition at any time prior to the dissolution court's final judgment. Indeed, Indiana Code Section 31-15-2-12 expressly permits a party who has filed an action for dissolution of marriage to subsequently move to dismiss that action. This permission is consistent with what is historically known as the statutory "cooling off" period, *see Mendenhall v. Mendenhall*, 116 Ind. App. 545, 551, 64 N.E.2d 806, 809 (1946), under which a final hearing on a petition for dissolution may not be conducted earlier than sixty days after the filing of the petition. Ind. Code § 31-15-2-10. Rather than providing the dissolution court with the discretion to deny a motion to dismiss a dissolution petition, our dissolution statute provides that the opposing party may file a counter petition for dissolution within five days after the motion to dismiss has been filed, and if the opposing party does so, the timeframe for the final hearing shall be based on the filing date of the initial, rather than the counter, petition. Ind. Code § 31-15-2-12(c).

[32] The primary goal in interpreting a statute is to fulfill the legislature's intent and, if the language is clear and unambiguous, we simply apply its plain and ordinary meaning, heeding both what it does say and what it does not say. *In re Adoption of D.M.*, 82 N.E.3d 354, 360 (Ind. Ct. App. 2017). We presume the legislature intended logical application of the language used in the statute so as to avoid unjust or absurd results. *Id*. Based on the plain language of Indiana Code Section 31-15-2-12, we do not think the legislature intended to grant a trial court the discretion to compel an unwilling petitioner to continue to prosecute her petition to final decree.

[33] Whitney mentions but does not meaningfully discuss Indiana Code Section 31-15-2-12 in his briefs on appeal. Instead, he relies on a 1960 Indiana Supreme Court case for the general proposition that a trial court's decision to grant or deny a motion to dismiss is within the trial court's discretion. *See State ex rel. Dunn v. Circuit Court of Morgan Cty.*, 241 Ind. 168, 169, 170 N.E.2d 443, 444 (1960). However, this case is not only factually inapposite, it was written in accordance with the long-outdated Indiana Divorce Act. Our current dissolution statute controls the procedure for dissolving a marriage and, by its plain language, provides a petitioner in a dissolution of marriage action the ability to unilaterally change her mind. In short, Susan was entitled to the dismissal of her petition as a matter of law. Had she moved for summary judgment in the dissolution action on this issue, as her attorney told O'Connor prior to Jerry's death she intended to do, she would have prevailed, and the dissolution action would have been dismissed. Thus, as we will explain more

fully below, once Susan filed her motion to dismiss, nothing O'Connor did or failed to do would have created a different result.

## Section 1.2 – Whitney had no authority to file a counter petition for dissolution on Jerry's behalf.

[34]     The dissolution court's decision to set aside its prior dismissal of Susan's dissolution petition was based upon Whitney's counter petition for dissolution. Thus, we look to whether Indiana law in 2012 and 2013 authorized Whitney, as Jerry's guardian, to keep the dissolution action alive by filing a counter petition for dissolution on behalf of Jerry. Indiana law did not authorize Whitney to do so.

[35]     In 1951, the Indiana Supreme Court decided *State ex rel. Quear v. Madison Circuit Court*, 229 Ind. 503, 99 N.E.2d 254 (1951). In *Quear*, the Court addressed a substantially similar question to the one presented here, namely, whether a guardian could file a petition for divorce on behalf of an incapacitated individual. Specifically, the incapacitated individual in *Quear* had been adjudicated insane. The court explained:

> An insane person cannot bring an action for divorce because he cannot consent to the filing of the complaint. The wrongs which may be committed by a husband or wife are not, of themselves, sufficient to dissolve the bonds of matrimony. The injured party, if insane, may, upon recovering his or her reason, condone the wrong, or continue the marriage relation notwithstanding the delinquencies of the other party….

Nor do the statutes on divorce or guardianship authorize the institution of a suit for divorce by the guardian in behalf of his ward. The right to divorce is not a common law right, but depends upon legislative enactments. Marriage is not only a civil contract, but it creates a status or relation. With this status or relation courts can interfere only to the extent and in the manner prescribed by statute. The statutory provisions for a separation from bed and board for a limited time adopt the statutory provisions for an absolute divorce as to residence and proof thereof, and the practice and proceedings of the court. Section 3-1231, Burns' 1946 Replacement, Acts 1903, ch. 48, § 4, p. 114. The statutes on divorce grant no right to a guardian to prosecute an action for divorce, but on the other hand provide, "Divorces may be decreed upon the application of the injured party * * * [.]" Section 3-1203, Burns' 1946 Replacement, Supplement, provides in part, "and the petitioner shall, with such petition, file with the clerk of the court an affidavit subscribed and sworn to by such petitioner in which the petitioner shall state the length of time the petitioner, or the defendant spouse, as the case may be, has been a resident of the state * * *."

*There is no statutory authorization in any of the acts providing for the appointment of a guardian which would authorize a guardian to prosecute an action for divorce.* In Pence v. Aughe, Guardian, 1885, 101 Ind. 317, [],this court held that the statutes on guardianship of minors and guardianship of insane persons did not authorize a suit by the guardian to annul a marriage of his ward. In Langdon v. Hadley, 1926, 85 Ind. App. 515, 150 N.E. 793, the Appellate Court of Indiana, upon the authority of the Pence case, supra, held that a guardian of an insane person could not prosecute an action to annul the marriage of his ward.

Since neither the statutes defining the powers of guardians nor the statutes on divorce authorize a guardian to prosecute an action for divorce, whether absolute or limited, the trial court had no jurisdiction to entertain the action in this case.

*Id.* at 256-58 (emphasis added; footnote, citations, and quotation marks omitted).

[36] Two Court of Appeals cases decided in 2013, just months after Jerry's death, followed the holding in *Quear*. In *Tillman v. Tillman*, a panel of this Court held that a guardian had no legal authority to file a petition for dissolution of her ward's marriage. 70 N.E.3d 349, 352 (Ind. Ct. App. 2013), *trans. denied*.[10] After discussing our supreme court's holding in *Quear*, we stated:

> *Neither the current Indiana statutes governing dissolution of marriage nor those governing the guardianship of incapacitated persons provide a means for the guardian of an incapacitated person to file a petition for dissolution of marriage on behalf of the incapacitated person.* The facts of the present case are parallel to the facts of *Quear* in this regard. In this case, both Husband and Wife are incapacitated and neither are competent to consent to the filing of a dissolution petition. Since Indiana statute does not provide guardians of incapacitated persons the authority to petition for dissolution of marriage on the incapacitated person's behalf, the trial court's dismissal of the motion Wagner filed on Husband's behalf was proper.
>
> Husband argues that the *Quear* decision is "no longer consistent" with Indiana's no fault divorce policy. He further asserts that certain provisions of the guardianship statute can be read to allow a guardian to file for dissolution of marriage on behalf of

---

[10] The petition to transfer in *Tillman* presented the following question for our supreme court's review: "Whether [*Quear*], holding that a guardian may not maintain an action for dissolution of marriage [o]n behalf of an incapacitated person[,] should be modified[] since that decision is inconsistent with the current Indiana 'no fault' divorce laws and has been implicitly rejected by pertinent provisions of the Indiana probate code enacted since 1951." *Tillman*, 70 N.E.3d 349 (No. 87A05-1212-DR-619), Pet. to Trans. at 2. Our supreme court unanimously denied the transfer petition.

his ward. While Husband would have us read these statutes broadly, we decline the invitation to contravene our supreme court's holding in *Quear*.

We acknowledge that *Quear* was decided more than sixty years ago, in 1951. Some might argue that the intervening decades of higher and higher divorce rates and the creation of federal and state programs to assist the elderly have radically changed civil society's notions concerning what the vows of "for better and for worse" mean. Therefore, for some, this might seem an appropriate time to revisit *Quear*. But *Quear* relied on the public policy pronouncements of the General Assembly within Indiana's divorce and guardianship statutes, and those statutes have not changed appreciably regarding the issue before us since *Quear*. For example, *the General Assembly has yet to provide to a guardian the statutory authority to file for dissolution of marriage on behalf of the incapacitated person*. And *Quear* has not been modified, let alone overruled, by any subsequent supreme court decision. Therefore, *Quear* remains controlling law in Indiana and controls the result in this case.

*Id.* (emphases added; footnote omitted).

[37] Another panel of this Court reached the same result, for substantially the same reasons, in *McGee v. McGee*, stating as follows:

Husband's co-guardians argue that the rule set forth in *Quear* has the effect of "[p]rohibiting a guardian from bringing action to dissolve the marriage on behalf of his incapacitated ward [which] causes the guardian to be in conflict with his oath to preserve the property and protect the health and welfare of their incapacitated ward." Appellee's Br. at 5. While this claim is carefully expressed in terms of the co-guardians' responsibility to Husband, their ward and father, there is no evidence in the record of any competent expression of Husband desiring

anything other than his continued marriage to Wife, and Wife clearly desires to remain married to Husband, whether he is competent or not. The real reason for the co-guardians' claims considers neither the love of Husband and Wife, nor their vows of "for better and for worse." For good reason, and as our supreme court made clear in *Quear*, and as re-emphasized in this court's recent opinion [in *Tillman*], the right to divorce is a legislatively-created right, not a judicially-created right.

While the statutes governing dissolution and guardianship in Indiana have evolved since 1951, when *Quear* was decided, it is still the case today that neither the current Indiana statutes governing dissolution of marriage nor those governing the guardianship of incapacitated persons provide a means for a guardian to file a petition for dissolution of marriage on behalf of his or her ward. Dissolution of marriage actions in Indiana are governed by Indiana Code Title 31, Article 15, which provides that a party who seeks to initiate a dissolution of marriage proceeding must file a verified petition for dissolution. Ind. Code § 31-15-2-5. Indiana Code section 29-3-8-4 provides that the guardian of an incapacitated person may take action and make decisions for the benefit of the incapacitated person. For example, the guardian may "invest and reinvest the property of the protected person," may exercise control over the incapacitated person's business or income, and, if reasonable, may "delegate to the protected person certain responsibilities for decisions affecting the protected person's business affairs and well-being." *Neither statute, however, provides the guardian with the right to file a petition for dissolution on behalf of the incapacitated person.* In a world full of subsequent marriages and available pre-nuptial agreements, we will not read into a statute such a sweeping and potentially overreaching authority, authority that is not the clearly expressed intent of the General Assembly.

Therefore, since Indiana statute does not provide guardians with the authority to petition for dissolution of marriage on the ward's

behalf, the trial court's grant of the petition for dissolution [the co-guardians] filed on Husband's behalf was improper.

998 N.E.2d 270, 271-72 (Ind. Ct. App. 2013) (emphasis added; first two alterations original to *McGee*).

[38]   Although our supreme court's opinion in *Quear* predates by some decades the current Dissolution of Marriage Act, this Court's opinions in *Tillman* and *McGee* confirmed the continued applicability of *Quear*'s reasoning to the instant case.   As the trial court recognized in its order on summary judgment, *Quear* was controlling authority during O'Connor's representation of Jerry in the dissolution proceedings, and thus O'Connor was correct when he advised Whitney that there was no specific legal authority allowing a guardian to petition for dissolution on behalf of a guardian's ward.[11]

[39]   Whitney asserts that *Quear* applied only to petitions to initiate a dissolution, not to counter petitions, and, thus, that the trial court erred when it held that *Quear* precluded a guardian from filing a counter petition for dissolution of marriage. He maintains that "the counter petition simply agrees with *continued prosecution*

---

[11] Although *Tillman* and *McGee* were decided after the dissolution court dismissed the dissolution as moot in light of Jerry's death and, as such, was not controlling authority, we nonetheless think they demonstrate how *Quear* would have applied to the instant facts, which also comports with O'Connor's understanding. We note that *Quear* and its progeny remained applicable until 2014 amendments to the guardianship and dissolution statutes. *See* Ind. Code § 29-3-8-4(12) and Ind. Code § 31-15-2-5(b) (now enabling a guardian to petition trial court for authority to petition for dissolution of ward's marriage).

of the other spouse's action." Appellants' Br. at 34. Whitney argues, in effect, that a counter petition has no independent significance.

[40] To the contrary, a counter petition for dissolution stands on its own and is equivalent to an initial petition for dissolution in its operation and effect. *See Braden v. Braden*, 575 N.E.2d 293, 294-95 (Ind. Ct. App. 1991), *trans. denied* (1992). Indeed, a dissolution action may proceed on a valid counter petition even after the original petition has been dismissed. *Id*; Ind. Code § 31-15-2-12. That was the very rationale for Whitney's putative counter petition here, namely, to keep the case alive in light of Susan's motion to dismiss her petition. Accordingly, we reject Whitney's argument that there is a material difference between a petition and a counter petition for dissolution of marriage and that *Quear* is inapplicable. At all times relevant here, both petitions and counter petitions required a verified averment by the petitioner of the grounds for dissolution, *see* Ind. Code § 31-15-2-3, this being the fundamental reason our supreme court held in *Quear* that a guardian is unauthorized to make such an averment on behalf of his ward. *Quear*, 229 Ind. at 505-508, 99 N.E.2d at 256-58. In this respect, for all intents and purposes, a petition and a counter petition are indistinguishable. As such, the time to file a counter petition for dissolution of marriage would have been before Jerry was declared incapacitated and appointed a guardian, some ten months before O'Connor was retained. We

hold that *Quear* was applicable and precluded Whitney's counter petition as Jerry's guardian. [12]

[41]     Even assuming that *Quear* applied to preclude his counter petition as Jerry's guardian, Whitney maintains that he also held power of attorney and, as Jerry's attorney-in-fact, he had authority to file a counter petition for dissolution on Jerry's behalf. Whitney contends that Indiana Code Section 30-5-5-11 grants attorneys-in-fact broad powers to prosecute claims on behalf of their principals and that there is nothing in that statute to suggest that an attorney-in-fact lacks authority to file a counter petition for dissolution of marriage to prevent an "exploitive dismissal by the estranged spouse." Appellants' Br. at 38. Whitney asserts, in effect, that because the statute does not specifically prohibit a counter petition for dissolution of marriage, it must be permitted. The trial court held, however, that an attorney-in-fact does not have plenary authority to file a petition or counter petition for dissolution of marriage, and we agree.

---

[12] Still, Whitney urges us to ignore *Quear* on the basis that allowing a guardian to file a counter petition for dissolution is necessary to defeat the other spouse's malicious tactical intent. The gravamen of Whitney's complaint is that Susan's motion to dismiss sought to take unfair advantage of Jerry and was a "unilateral and exploitative dismissal." Appellants' Br. at 28, 33. In any event, we decline Whitney's invitation to attribute a bad motive to Susan because her motive is irrelevant. Susan had an unfettered right to file her petition for dissolution and an unfettered right to withdraw her petition. As noted by O'Connor, "the true triggering cause for any damages or decrease" in Whitney's inheritance from Jerry's estate was the order granting the guardianship over Jerry. Appellants' App. Vol. 2 at 210. "Once this Guardianship was established, [Susan] had complete control to either work towards a negotiated settlement of the [dissolution] action, or simply dismiss her Petition for Dissolution at any time and effectively end the entire Dissolution process and secure her status as Jerry's spouse …." *Id.* As Whitney's own expert observed, "[O'Connor] took the case as he found it …, the case did not appear anew at the beginning of his representation." Appellants' App. Vol. 7 at 95. He was the fourth attorney to represent Jerry in the dissolution, which had been pending for some three and a half years, and the guardianship over Jerry had already been established ten months earlier. In other words, O'Connor's professional hands were tied before he was even retained.

[42] The power of attorney statute generally authorizes an attorney-in-fact to assert or prosecute "a cause of action, a claim, a counterclaim, an offset, or a defense" and then describes in some detail the nature and extent of that authority, but the statute makes no mention of a petition or counter petition for dissolution of marriage despite various other specifically enumerated powers. Ind. Code § 30-5-5-11. When determining legislative intent, it is a long-standing principle of statutory construction that the enumeration of certain things in a statute necessarily implies the exclusion of all others. *Brandmaier v. Metro. Dev. Comm'n of Marion Cty.,* 714 N.E.2d 179, 180 (Ind. Ct. App. 1999), *trans. denied*. And, as we have already stated, we must be mindful of both what the statute says and what the statute does not say. *ESPN, Inc. v. Univ. of Notre Dame Police Dep't*, 62 N.E.3d 1192, 1195 (Ind. 2016).

[43] We will not extend the power of attorney statute beyond the clearly expressed legislative intent. Considering that an individual's marital status is uniquely personal, and that the power of an agent to dissolve the marriage of his principal is fraught with potential for mischief, we deem it significant that the statute does not speak specifically to dissolutions of marriage. The same reasoning which applied to guardians in *Quear*, *Tillman*, and *McGee* applies with even greater force to attorneys-in-fact, who, unlike guardians, usually act without court supervision. We agree with the trial court that no statutory law authorized Whitney, as Jerry's attorney-in-fact, to prosecute a petition or counter petition for dissolution of marriage on Jerry's behalf.

[44] In sum, Whitney's purported counter petition for dissolution of marriage should have been dismissed and would have been declared invalid, as a matter of law, if Susan had challenged the same. As stated above, once Susan moved to dismiss her dissolution petition, as she was entitled to do, there is nothing O'Connor did or failed to do for his incapacitated client that would have created a different result.

## Section 1.3 – O'Connor could not compel Susan to settle the dissolution action prior to her motion to dismiss.

[45] Both at the summary judgment level and on appeal, Whitney has spent considerable effort belaboring the actions he alleges that O'Connor could and should have taken (the alleged breach of his duty of care) soon after his retention to expeditiously obtain a dissolution of Jerry's marriage.[13] The crux of Whitney's designated expert's testimony, however, was not that any of those actions were valid or would have been successful in moving the actual dissolution court proceedings to final decree, but that, had O'Connor engaged in these strategies, Susan would have been motivated to settle. Newton's testimony essentially outlined steps, such as pushing for a final dissolution hearing and seeking bifurcation of the dissolution and the property distribution, that O'Connor could have taken to put pressure on Susan to settle. However,

---

[13] Whitney repeatedly refers to O'Connor's failure to obtain a dissolution of Jerry's marriage during the ten-month period between when he learned of Jerry's dire health, in May of 2012, and the date of Jerry's death, March 18, 2013. However, as we concluded above, once Susan moved to dismiss her dissolution petition on September 20, 2012, the dissolution proceedings should have come to an end. So, the only relevant time is the short period during which O'Connor represented Jerry prior to Susan's motion to dismiss.

when asked whether Susan would have been more likely to settle had O'Connor engaged in his proposed strategy, Newton could only speculate. In particular, Newton admitted that "it [wa]s a dynamic situation," that "[c]lients settle cases all the time" for any number of reasons, and that "we don't know the totality of the considerations that [Susan] and [her attorney] were working with." Appellants' App. Vol. 7 at 90-91.

[46] Such speculation is insufficient to avoid summary judgment. *Cf. Prancik v. Oak Hill United Sch. Corp.*, 997 N.E.2d 401, 405 (Ind. Ct. App. 2013), *trans. denied* (2014). While Newton criticized O'Connor's strategy and tactics, he stopped well short of stating that but for O'Connor's allegedly inadequate strategy that the outcome would have been more favorable to Whitney. *See, e.g.*, *Cannistra v. O'Connor, McGuinness, Conte, Doyle, Oleson & Collins*, 728 N.Y.S.2d 770, 771 (N.Y. App. Div. 2001) (holding that the clients had failed to demonstrate that, but for the attorney's negligence, "they would have accepted the . . . settlement offer and not . . . sustained any damages."). Significantly, it is undisputed that there is nothing O'Connor could have done to actually compel Susan to settle the case and finalize a dissolution of the marriage. In short, no genuine issue of material fact remains on the issue of proximate cause.

## Conclusion

[47] The designated evidence negates the element of proximate cause on Whitney's legal malpractice claim. Nothing that Whitney claims O'Connor could have done would have produced a better outcome in the dissolution proceeding

given the guardianship and the state of the law at the time of the representation. Susan was entitled to a dismissal of her own dissolution petition, and the dissolution court should have further granted her motion to dismiss Whitney's putative counter petition. Even had Jerry lived and O'Connor been successful in pursuing the counter petition in the dissolution court, Susan would have prevailed on appeal, and the entirety of the dissolution proceeding been vacated, based on the dissolution court's erroneous rulings. Moreover, O'Connor could not compel Susan to settle the dissolution action prior to her motion to dismiss.

[48] Thus, as a matter of law, O'Connor's representation of Jerry during the dissolution was not the proximate cause of any damages from loss of inheritance that Whitney may have incurred. As there is no proximate cause between O'Connor's alleged errors and Whitney's alleged loss, we affirm the trial court's entry of summary judgment in favor of O'Connor.

[49] Affirmed.

May, J., and Pyle, J., concur.